**UNITED STATES of America,**
**Appellee,**

v.

**Francisco TOSCANINO, Appellant.**

**No. 746, Docket 73–2732.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 13, 1974.

Decided May 15, 1974.

As Amended on Denial of Rehearing
Aug. 21, 1974.

Rehearing En Banc Denied Oct. 8, 1974.

Ivan S. Fisher, New York City (Alan Scribner, Krieger, Fisher, Metzger & Scribner, New York City, of counsel), for appellant.

Thomas P. Puccio, Asst. U. S. Atty. (Edward J. Boyd, V, U. S. Atty., E. D. N. Y., L. Kevin Sheridan, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before ANDERSON, MANSFIELD and OAKES, Circuit Judges.

MANSFIELD, Circuit Judge:

Francisco Toscanino appeals from a narcotics conviction entered against him in the Eastern District of New York by Chief Judge Jacob Mishler after a jury trial. Toscanino was sentenced to 20 years in prison and fined $20,000. He contends that the court acquired jurisdiction over him unlawfully through the conduct of American agents who kidnapped him in Uruguay, used illegal electronic surveillance, tortured him and abducted him to the United States for the purpose of prosecuting him here. We remand the case to the district court for further proceedings in which the government will be required to respond to his allegations concerning the methods by which he was brought into the Eastern District and the use of electronic surveillance to gather evidence against him.

Toscanino, who is a citizen of Italy, and four others were charged with conspiracy to import narcotics into the United States in violation of 21 U.S.C. §§ 173 and 174 in a one count indict-

ment returned by a grand jury sitting in the Eastern District on February 22, 1973. The other defendants were Armando Nicolay, Segundo Coronel, Roberto Arenas and Umberto Coronel. Also named as a conspirator but not as a defendant was one Hosvep Caramian. At a joint trial of all the defendants (except for Nicolay who had fled to Argentina), which began on May 22, 1973, the only government witness against Toscanino was Caramian [1] who testified that he met with Toscanino in Montevideo, Uruguay, during the summer of 1970 and agreed to find buyers for a shipment of heroin into the United States, which would be delivered by Nicolay. Caramian testified further that in November, 1970, he left Uruguay and came to the United States where he met with Arenas and the Coronel brothers who agreed to buy the heroin. On November 30, 1970, Caramian received part of Toscanino's shipment delivered by Nicolay in Miami, Florida, but ultimate distribution of the narcotics was intercepted by government agents who posed as buyers from Arenas and the Coronel brothers. Toscanino, testifying in his own behalf, denied any knowledge of these transactions. On June 5, 1973, the jury returned a verdict of guilty against him and all the other defendants.

Toscanino does not question the sufficiency of the evidence or claim any error with respect to the conduct of the trial itself. His principal argument, which he voiced prior to trial and again after the jury verdict was returned, is that the entire proceedings in the district court against him were void because his presence within the territorial jurisdiction of the court had been illegally obtained. He alleged that he had been kidnapped from his home in Montevideo, Uruguay, and brought into the Eastern District only after he had been detained for three weeks of interrogation accompanied by physical torture in Brazil. He offered to prove the following:

"On or about January 6, 1973 Francisco Toscanino was lured from his home in Montevideo, Uruguay by a telephone call. This call had been placed by or at the direction of Hugo Campos Hermedia. Hermedia was at that time and still is a member of the police in Montevideo, Uruguay. In this effort, however, and those that will follow in this offer, Hermedia was acting *ultra vires* in that he was the paid agent of the United States government. . . .

". . . The telephone call ruse succeeded in bringing Toscanino and his wife, seven months pregnant at the time, to an area near a deserted bowling alley in the City of Montevideo. Upon their arrival there Hermedia together with six associates abducted Toscanino. This was accomplished in full view of Toscanino's terrified wife by knocking him unconscious with a gun and throwing him into the rear seat of Hermedia's car. Thereupon Toscanino, bound and blindfolded, was driven to the Uruguayan-Brazilian border by a circuitous route.
. . .

"At one point during the long trip to the Brazilian border discussion was had among Toscanino's captors as to changing the license plates of the abductor's car in order to avoid detection by the Uruguayan authorities. At another point the abductor's car was abruptly brought to a halt, and Toscanino was ordered to get out. He was brought to an apparently secluded place and told to lie perfectly still or he would be shot then and there. Although his blindfold prevented him from seeing, Toscanino could feel the barrel of the gun against his head and could hear the rumbling noises of what appeared to be an Uruguayan military convoy. A short time after the noise of the convoy had died away, Toscanino was placed in another vehicle and whisked to the border. There by pre-arrangement and again at the connivance of the United States government, the car was met by a group of Brazilians who

---

1. At the time of Toscanino's trial, Caramian was already serving an 18-year sentence for narcotics violations and bail jumping.

took custody of the body of Francisco Toscanino.

"At no time had there been any formal or informal request on the part of the United States of the government of Uruguay for the extradition of Francisco Toscanino nor was there any legal basis to justify this rank criminal enterprise. In fact, the Uruguayan government claims that it had no prior knowledge of the kidnapping nor did it consent thereto and had indeed condemned this kind of apprehension as alien to its laws.

"Once in the custody of Brazilians, Toscanino was brought to Porto Alegre where he was held incommunicado for eleven hours. His requests to consult with counsel, the Italian Consulate, and his family were all denied. During this time he was denied all food and water.

"Later that same day Toscanino was brought to Brasilia. . . . For seventeen days Toscanino was incessantly tortured and interrogated. Throughout this entire period the United States government and the United States Attorney for the Eastern District of New York prosecuting this case was aware of the interrogation and did in fact receive reports as to its progress. Furthermore, during this period of torture and interrogation a member of the United States Department of Justice, Bureau of Narcotics and Dangerous Drugs was present at one or more intervals and actually participated in portions of the interrogation. . . . [Toscanino's] captors denied him sleep and all forms of nourishment for days at a time. Nourishment was provided intravenously in a manner precisely equal to an amount necessary to keep him alive. Reminiscent of the horror stories told by our military men who returned from Korea and China, Toscanino was forced to walk up and down a hallway for seven or eight hours at a time. When he could no longer stand he was kicked and beaten but all in a manner contrived to punish without scarring. When he would

not answer, his fingers were pinched with metal pliers. Alcohol was flushed into his eyes and nose and other fluids . . . were forced up his anal passage. Incredibly, these agents of the United States government attached electrodes to Toscanino's earlobes, toes, and genitals. Jarring jolts of electricity were shot throughout his body, rendering him unconsious for indeterminate periods of time but again leaving no physical scars.

"Finally on or about January 25, 1973 Toscanino was brought to Rio de Janeiro where he was drugged by Brazilian-American agents and placed on Pan American Airways Flight # 202 destined for the waiting arms of the United States government. On or about January 26, 1973 he woke in the United States, was arrested on the aircraft, and was brought immediately to Thomas Puccio, Assistant United States Attorney.

"At no time during the government's seizure of Toscanino did it ever attempt to accomplish its goal through any lawful channels whatever. From start to finish the government unlawfully, willingly and deliberately embarked upon a brazenly criminal scheme violating the laws of three separate countries."

The government prosecutor neither affirmed nor denied these allegations but claimed they were immaterial to the district court's power to proceed.

Toscanino alleged further that, prior to his forcible abduction from Montevideo, American officials bribed an employee of the public telephone company to conduct electronic surveillance of him and that the results of the surveillance were given to American agents and forwarded to government prosecutors in New York. According to Toscanino, the telephone company employee was eventually arrested in Uruguay for illegal eavesdropping and was indicted and imprisoned. In connection with these latter allegations Toscanino moved, pursu-

ant to 18 U.S.C. § 3504,[2] to compel the government to affirm or deny whether in fact there had been any electronic surveillance of him in Uruguay.

Toscanino's motion for an order vacating the verdict, dismissing the indictment and ordering his return to Uruguay was denied by the district court on November 2, 1973, without a hearing. Relying principally on the decisions of the Supreme Court in Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), and Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), the court held that the manner in which Toscanino was brought into the territory of the United States was immaterial to the court's power to proceed, provided he was physically present at the time of trial. Concerning the wiretap allegations, the court asked the prosecutor to represent whether there had actually been any electronic surveillance of Toscanino in Uruguay. The prosecutor responded that "[i]n no way was electronic surveillance used or the fruits of electronic surveillance." The court then ruled that no hearing was required on the wiretap allegations and denied the motion to vacate the verdict on that ground. From these rulings Toscanino appeals.

### *Alleged Forcible Abduction From Uruguay*

In an era marked by a sharp increase in kidnapping activities, both here and abroad, see, e. g., New York Times, Jan. 5, 1974, at 25, col. 6, Dec. 13, 1973, at 2, col. 5, Oct. 17, 1973, at 14, col. 5, we face the question as we must in the state of the pleadings, of whether a federal court must assume jurisdiction over the person of a defendant who is illegally apprehended abroad and forcibly abducted by government agents to the United States for the purpose of facing criminal charges here. The answer necessitates a review and appraisal of two Supreme Court decisions, heavily relied upon by the government and by the district court, Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1888), and Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952). For years these two cases have been the mainstay of a doctrine to the effect that the government's power to prosecute a defendant is not impaired by the illegality of the method by which it acquires control over him. This teaching originated almost 90 years ago in *Ker*. While residing in Peru, Ker was indicted by an Illinois grand jury for larceny and embezzlement. At the request of the Governor of Illinois the President, invoking the current treaty of extradition between the United States and Peru, issued a warrant authorizing a Pinkerton agent to take custody of Ker from the authorities of Peru. The warrant, however, was never served, probably for the reason that by the time the agent arrived there armed forces of Chile, then at war with Peru, were in control of Lima. See Ker v. Illinois Revisited, 47 Am.J.Int'l L. 678 (1953). Instead Ker was forcibly abducted by the agent, placed aboard an American vessel and eventually taken to the United States, where he was tried and convicted in Illinois. The Supreme Court rejected Ker's argument that he was entitled by virtue of the treaty with Peru to a right of asylum there and held that the abduction of Ker did not violate the Due Process Clause of the Four-

2. 18 U.S.C. § 3504 provides:
"(a) In any trial, hearing, or other proceeding in or before any court . . . of the United States
(1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act;

\* \* \* \* \*

(b) As used in this section 'unlawful act' means any act the use of any electronic, mechanical, or other device (as defined in section 2510(5) of this title) in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto."

teenth Amendment (then less than 20 years old), which was construed as merely requiring that the party be regularly indicted and brought to trial "according to the forms and modes prescribed for such trials." The Court accordingly held that Ker might be tried by Illinois, regardless of the method by which it acquired control over him.

Sixty-six years later the Supreme Court again faced the question in Frisbie v. Collins, *supra*, in a slightly different context. There a Michigan state prisoner, petitioning for habeas corpus, alleged that he had been brought from Chicago, Illinois, to Michigan for trial only after he had been kidnapped, handcuffed and blackjacked in Chicago by Michigan police officers who had gone there to retrieve him. The prisoner claimed that his conviction in Michigan violated the Due Process Clause of the Fourteenth Amendment as well as the federal Kidnapping Act, 18 U.S.C. § 1201,[3] and was therefore a nullity. Rejecting the due process claim the Supreme Court explained.

"This Court has never departed from the rule announced in Ker v. Illinois, 119 U.S. 436, 444, [7 S.Ct. 225, 229, 30 L.Ed. 421], that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.' No persuasive reasons are now presented to justify overruling this line of cases. They rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after being fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards." 342 U.S. at 522.

Thus, under the co-called "Ker-Frisbie" rule, due process was limited to the guarantee of a constitutionally fair trial, regardless of the method by which jurisdiction was obtained over the defendant. Jurisdiction gained through an indisputably illegal act might still be exercised, even though the effect could be to reward police brutality and lawlessness in some cases.

Since *Frisbie* the Supreme Court, in what one distinguished legal luminary describes as a "constitutional revolution," see Griswold, The Due Process Revolution and Confrontation, 119 U. Pa.L.Rev. 711 (1971), has expanded the interpretation of "due process." No longer is it limited to the guarantee of "fair" procedure at trial. In an effort to deter police misconduct, the term has been extended to bar the government from realizing directly the fruits of its own deliberate and unnecessary lawlessness in bringing the accused to trial. See United States v. Russell, 411 U.S. 423, 430–431, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). Concurrent with these decisions the Ker-Frisbie rule has been criticized and its continued validity repeatedly questioned. See, e. g., Pitler, "The Fruit of the Poisonous Tree" Revisited and Shepardized, 56 Calif.L.Rev. 579, 600 (1968); Scott, Criminal Jurisdiction of a State Over a Defendant Based Upon Presence Secured by Force or Fraud, 37 Minn.L.Rev. 91, 102, 107 (1953); Allen, Due Process and State

---

3. 18 U.S.C. § 1201 provides:
"(a) Whoever knowingly transports in interstate or foreign commerce, any person who has been unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away and held for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof, shall be punished (1) by death if the kidnapped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed."

Criminal Procedures: Another Look, 48 N.W.U.L.Rev. 16, 27–28 (1953); Supreme Court 1951 Term, 66 Harv.L.Rev. 89, 126–27 (1953); United States v. Edmons, 432 F.2d 577, 583 (2d Cir. 1970); Government of Virgin Islands v. Ortiz, 427 F.2d 1043, 1045 n. 2 (3d Cir. 1970).

The erosion of *Frisbie* appears to have been anticipated by a decision handed down a little more than two months earlier. In Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L. Ed. 183 (1952), decided at the same Term as *Frisbie*, the Supreme Court broadened its interpretation of due process to set aside for the first time a state court conviction resting on evidence obtained through police brutality. In that case state police officers had frustrated a defendant's efforts to swallow two morphine capsules in his possession by taking the defendant, handcuffed, to a hospital where a doctor was induced to force "an emetic solution through a tube into [the defendant's] stomach against his will." When the solution produced vomiting the capsules were recovered and subsequently introduced at defendant's trial. Reversing the resulting conviction, Justice Frankfurter wrote for a majority of the Court:

"Regard for the requirements of the Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings [resulting in a conviction] in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.'

\*      \*      \*      \*      \*      \*

"Applying these general considerations to the circumstances of the present case, we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too categorically. This is conduct that shocks the conscience.    .    .    .

"It has long since ceased to be true that due process of law is heedless of the means by which otherwise relevant and credible evidence is obtained. This was not true even before the series of recent cases enforcing the constitutional principle that the States may not base convictions upon confessions, however much verified, obtained by coercion. These decisions are not arbitrary exceptions to the comprehensive right of States to fashion their own rules of evidence for criminal trials. They are not sports in our constitutional law but applications of a general principle. They are only instances of the general requirement that States in their prosecutions respect certain decencies of civilized conduct. Due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend a 'sense of justice.'" 342 U.S. 169, 172–173.

The underpinnings of *Frisbie* were further weakened by the Supreme Court's landmark decision in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L. Ed.2d 1081 (1961), where, overruling Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), it interpreted the Due Process Clause of the Fourteenth Amendment to require that the Exclusionary Rule be applied in state prosecutions, just as it had for years been binding on the federal courts, Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Thenceforth evidence obtained by state officers as the result of illegal search or seizure could no longer be admitted in a state criminal trial of the person from whom it was unlawfully seized. As the Supreme Court has repeatedly made clear, the Exclusionary Rule has nothing to do with the fair determination of the guilt or innocence of the accused. It represents a judicially-created device designed to deter disregard for constitutional prohibitions and give substance to constitu-

tional rights. Mapp v. Ohio, 367 U.S. 643, 646, 81 S.Ct. 1684, 6 L.Ed.2d 1081. In the words of Justice Holmes, to allow the government to benefit illegally from seized evidence, "reduces the Fourth Amendment to a form of words," Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). The philosophy behind the rule and possible broader application of the basic principle underlying it was best described by Justice Brandeis in an oft-quoted passage from his dissenting opinion in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), which we have only recently invoked again, see United States v. Archer, 486 F.2d 670, 674–675 (2d Cir. 1973):

> "The court's aid is denied only when he who seeks it has violated the law in connection with the very transaction as to which he seeks legal redress. Then aid is denied despite the defendant's wrong. It is denied in order to maintain respect for law; in order to promote confidence in the administration of justice; in order to preserve the judicial process from contamination. . . .
>
> "Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doc-

trine this court should resolutely set its face." 277 U.S. at 484–485.

Society is the ultimate loser when, in order to convict the guilty, it uses methods that lead to decreased respect for the law. See United States v. Archer, *supra* at 677.

◼ Thus the Court's decisions in *Rochin* and *Mapp* unmistakably contradict its pronouncement in *Frisbie* that "due process of law is satisfied when one present in court is convicted of crime after being fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards." The requirement of due process in obtaining a conviction is greater. It extends to the pretrial conduct of law enforcement authorities. The force of *Rochin* continues to be recognized. In United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L. Ed.2d 366 (1973), for instance, the Court, although holding that the government's alleged entrapment activities did not violate the Constitution or federal law, warned that

> "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. Rochin v. California, 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183] (1952), the instant case is distinctly not of that breed." 411 U.S. at 431–432.

In United States v. Archer, *supra*, while basing our decision on other grounds, we referred to *Olmstead* and *Rochin* for the proposition that due process principles might be invoked to bar prosecution altogether where it resulted from flagrantly illegal law enforcement practices. In contrast, we have expressed doubt as to the validity of the *Frisbie* doctrine. In United States v. Edmons, 432 F.2d 577 (2d Cir. 1970), for instance, in rejecting the government's attempt to invoke *Frisbie* by analogy as

the basis for upholding a conviction obtained through the device of using arrests that were in fact pretexts for investigative activities, Judge Friendly stated:

> "We do not find *Frisbie* . . . and its predecessors . . . to be a truly persuasive analogy. Those cases were decided before the Fourth Amendment as such was held applicable to the states, . . . and thus rested only on general considerations of due process or, as in *Frisbie*, also on a claimed violation of the Federal Kidnapping Act. Whether the Court would now adhere to them must be regarded as questionable." United States v. Edmons, *supra* at 583 [footnotes and citations omitted].

Similar doubt was indicated by the Third Circuit in Government of Virgin Islands v. Ortiz, 427 F.2d 1043, 1045 n.2 (3d Cir. 1970), where it stated "We recognize that the validity of the *Frisbie* doctrine has been seriously questioned because it condones illegal police conduct."

■■ In light of these developments we are satisfied that the "Ker-Frisbie" rule cannot be reconciled with the Supreme Court's expansion of the concept of due process, which now protects the accused against pretrial illegality by denying to the government the fruits of its exploitation of any deliberate and unnecessary lawlessness on its part. Although the issue in most of the cases forming part of this evolutionary process was whether evidence should have been excluded (e. g., *Mapp, Miranda, Wong Sun, Silverman*), it was unnecessary in those cases to invoke any other sanction to insure that an ultimate conviction would not rest on governmental illegality. Where suppression of evidence will not suffice, however, we must be guided by the underlying principle that the government should be denied

the right to exploit its own illegal conduct, Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and when an accused is kidnapped and forcibly brought within the jurisdiction, the court's acquisition of power over his person represents the fruits of the government's exploitation of its own misconduct. Having unlawfully seized the defendant in violation of the Fourth Amendment,[4] which guarantees "the right of the people to be secure in their persons . . . against unreasonable . . . seizures," the government should as a matter of fundamental fairness be obligated to return him to his *status quo ante*.

■ Faced with a conflict between the two concepts of due process, the one being the restricted version found in *Ker-Frisbie* and the other the expanded and enlightened interpretation expressed in more recent decisions of the Supreme Court, we are persuaded that to the extent that the two are in conflict, the *Ker-Frisbie* version must yield. Accordingly we view due process as now requiring a court to divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights. This conclusion represents but an extension of the well-recognized power of federal courts in the civil context to decline to exercise jurisdiction over a defendant whose presence has been secured by force or fraud. See In re Johnson, 167 U.S. 120, 126, 17 S.Ct. 735, 42 L.Ed. 103 (1896); Fitzgerald Construction Co. v. Fitzgerald, 137 U.S. 98, 11 S.Ct. 36, 34 L.Ed. 608 (1890).

If the charges of government misconduct in kidnapping Toscanino and forcibly bringing him to the United States should be sustained, the foregoing principles would, as a matter of due process,

---

4. An illegal arrest constitutes a seizure of the person in violation of the Fourth Amendment, see Henry v. United States, 361 U.S. 98, 100–101, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); Giordenello v. United States, 357 U.S. 480, 485–488, 78 S.Ct. 1245, 2 L. Ed.2d 1503 (1958); Frankel, Concerning Searches and Seizures, 34 Harv.L.Rev. 361 (1921).

entitle him to some relief. The allegations include corruption and bribery of a foreign official as well as kidnapping, accompanied by violence and brutality to the person. Deliberate misconduct on the part of United States agents, in violation not only of constitutional prohibitions but also of the federal Kidnapping *Act, supra,* and of two international treaties obligating the United States Government to respect the territorial sovereignty of Uruguay, is charged. See U.N. Charter, art. 2; O.A.S. Charter, art. 17.[5] The conduct alleged here satisfies those tests articulated by the Supreme Court in its most recent "entrapment" decision, United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), where, in holding that due process did not bar prosecution for the manufacture and sale of an illegal drug, even though a government undercover agent had supplied a scarce chemical required for its synthesis, it noted that the government agent had violated no constitutional prohibition or federal law and had committed no crime in infiltrating the defendant's drug enterprise. It furthermore appeared that the type of undercover activity engaged in there by the agent was necessary in order to gather essential evidence. Here, in contrast, not only were several laws allegedly broken and crimes committed at the behest of government agents but the conduct was apparently unnecessary, as the extradition treaty between the United States and Uruguay, see 35 Stat. 2028, does not specifically exclude narcotics violations so that a representative of our government might have been able to conclude with Uruguay a special arrangement for Toscanino's extradition. Cf. Fiocconi v. Attorney General of United States, 339 F.Supp. 1242, 1244 (S.D.N.Y.1972).

▇▇ In any event, since *Ker* and *Frisbie* involved state court convictions only, the views expressed in those cases

would not necessarily apply to the present case, which is an appeal from a judgment entered by a federal district court. Here we possess powers not available to a federal court reviewing a state tribunal's resolution of constitutional issues. In this case we may rely simply upon our supervisory power over the administration of criminal justice in the district courts within our jurisdiction. See McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); United States v. Estepa, 471 F.2d 1132 (2d Cir. 1972); United States v. Freeman, 357 F.2d 108 (2d Cir. 1967); Williamson v. United States, 311 F.2d 441 (5th Cir. 1962). See Hogan & Snee, The McNabb-Mallory Rule: Its Rise, Rationale and Rescue, 47 Geo.L.J. 29, 32 (1952) (The "real roots of the *McNabb* rule" are found in a refusal to countenance "trials which are the outgrowth or fruit of the Government's illegality," since they "debase the processes of justice."). See also Government of Virgin Islands v. Ortiz, 427 F.2d 1043, 1045 n.2. Clearly this power may legitimately be used to prevent district courts from themselves becoming "accomplices in willful disobedience of law." See *McNabb, supra* at 345. Moreover the supervisory power is not limited to the admission or exclusion of evidence, but may be exercised in any manner necessary to remedy abuses of a district court's process. Cf. Rea v. United States, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233 (1955). Drawing again from the field of civil procedure, we think a federal court's criminal process is abused or degraded where it is executed against a defendant who has been brought into the territory of the United States by the methods alleged here. Cf. Commercial Mutual Accident Co. v. Davis, 213 U.S. 245, 29 S.Ct. 445, 53 L.Ed. 782 (1909); Fitzgerald Construction Co. v. Fitzgerald, *supra.* We could not tolerate such an abuse without debasing "the processes of justice."[6]

---

5. The relevant provisions of these Charters are set forth and discussed *infra.*

6. We recognize that the Ninth Circuit, in United States v. Cotten, 471 F.2d 744, 747–

If distinctions are necessary, *Ker* and *Frisbie* are clearly distinguishable on other legally significant grounds which render neither of them controlling here. Neither case, unlike that here, involved the abduction of a defendant in violation of international treaties of the United States. *Frisbie* presented an alleged *interstate* abduction in which the appellant was clearly extraditable and an order returning him to his asylum state, Illinois, would have been an exercise in futility since Illinois would have been obligated to return him to Michigan for trial. U.S.Const. Art. IV, § 2, cl. 2; 18 U.S.C. § 3182. Although the appellant in *Ker* argued that his forcible abduction by the Pinkerton agent violated the extradition treaty between the United States and Peru, the Supreme Court disagreed, holding that the extradition treaty did not apply and that it would have been violated by the demanding state only if, after receiving a fugitive, it tried him for a crime other than that for which he was surrendered. See United States v. Rauscher, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1888). Here, in contrast, Toscanino alleges that he was forcibly abducted from Uruguay, whose territorial sovereignty this country has agreed in two international treaties to respect. The Charter of the United Nations, the members of which include the United States and Uruguay, see Department of State, Treaties in Force 402–03 (1973), obligates "All Members" to "refrain . . . from the threat or use of force against the territorial integrity of political independence of any state. . . ." See U.N. Charter, art. 2 para. 4. Additionally, the Charter of the Organization of American States, whose members also include the United States and Uruguay, see Department of State, Treaties in Force 359 (1973), provides that the "territory of a state is inviolable; it may not be the object, even temporarily, . . . of . . . measures of force taken by another state, directly or indirectly, on any grounds whatever. . . ." See O.A.S. Charter, art. 17.

That international kidnappings such as the one alleged here violate the U.N. Charter was settled as a result of the Security Council debates following the illegal kidnapping in 1960 of Adolf Eichmann from Argentina by Israeli "volunteer groups." In response to a formal complaint filed by the U.N. representative from Argentina pursuant to article 35 of the U.N. Charter [7] the Security Council, by eight votes to none (with two abstentions and one member—Argentina—not participating in the vote), adopted a resolution condemning the kidnapping and requesting "the Govern-

---

748 (9th Cir. 1973), adhered to *Ker* and *Frisbie* in affirming the convictions of defendants who had been forcibly taken by United States officials from Viet Nam to the United States to stand trial. The case is distinguishable on several grounds. It may be judicially noticed that at the time of the transfer South Viet Nam, as an ally, was being maintained and supported by the United States and was occupied by American forces. Control over the appellants was relinquished by the Vietnamese authorities to the United States officials, and no extradition treaty existed between the Republic of Viet Nam and the United States, see pages 3515–16, *supra*. Furthermore, the Ninth Circuit noted, 471 F.2d at 748 n. 11:

"11. While the court recognizes that the vitality of the doctrine we follow may be in doubt, and that federal officers might be held to a higher standard of conduct than their state counterparts, we will not strike it down. Recent legislation and constitutional protections enunciated in the last decade provide viable alternative means of coping with undisciplined law enforcement activities."

The suggestion that such means offer an adequate substitute for the sanction of exclusion or dismissal has repeatedly been rejected by the Supreme Court. See Coolidge v. New Hampshire, 403 U.S. 443, 488, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (Exclusionary Rule is "only effectively available way" to compel respect for constitutional guarantees). Terry v. Ohio, 392 U.S. 1, 12, 88 S. Ct. 1868, 1875, 20 L.Ed.2d 889 (1968) ("experience has taught us that [Exclusionary Rule] is only effective deterrent . . . ").

7. Article 35 of the U.N. Charter permits member nations to bring "any dispute . . . to the attention of the Security Council or of the General Assembly."

ment of Israel to make appropriate reparation in accordance with the Charter of the United Nations and rules of international law. . . ." U.N.Doc. S/4349 (June 23, 1960), quoted in W. Friedmann, O. Lissitzyn & R. Pugh, International Law: Cases and Materials 497 (1969). The resolution merely recognized a long standing principle of international law that abductions by one state of persons located within the territory of another violate the territorial sovereignty of the second state and are redressable usually by the return of the person kidnapped. See The Vincenti Affair, 1 Hackworth, Digest of International Law 624 (1920); The Cantu Case, 2 Hackworth 310 (1914); The Case of Blatt and Converse, 2 Hackworth 309 (1911).

Since the United States thus agreed not to seize persons residing within the territorial limits of Uruguay, appellant's allegations in this case are governed not by *Ker* but by the Supreme Court's later decision in Cook v. United States, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933). In *Cook* officers of the United States Coast Guard boarded and seized a British vessel, the Mazel Tov, in violation of territorial limits fixed by a treaty then in force between the United States and Great Britain. The Supreme Court held that the government's subsequent libel for forfeiture of the vessel in the federal district court was properly dismissed, since under the treaty the forcible seizure was incapable of giving the district court power to adjudicate title to the vessel regardless of the vessel's physical presence within the court's jurisdiction. Distinguishing Ker v. Illinois, the Court said:

> "It is true that where the United States, having possession of property, files a libel to enforce a forfeiture resulting from a violation of its laws, the fact that the possession was acquired by a wrongful act is immaterial. Dodge v. United States, 272 U.S. 530, 532 [47 S.Ct. 191, 71 L.Ed. 392]. Compare Ker v. Illinois, 119 U.S. 436, 444 [7 S.Ct. 225, 30 L.Ed. 421]. The

doctrine rests primarily upon the common-law rules that any person may, at his peril, seize property which has become forfeited to, or forfeitable by, the government; and that proceedings by the government to enforce a forfeiture ratify a seizure made by one without authority, since ratification is equivalent to antecedent delegation of authority to seize. . . . The doctrine is not applicable here. The objection to the seizure is not that it was wrongful merely because made by one upon whom the government had not conferred authority to seize at the place where the seizure was made. *The objection is that the government itself lacked power to seize, since by the treaty it had imposed a territorial limitation upon its own authority.* The Treaty fixes the conditions under which a 'vessel may be seized and taken into a port of the United States, its territories or possessions for adjudication in accordance with' the applicable laws. Thereby, Great Britain agreed that adjudication may follow a rightful seizure. *Our government, lacking power to seize, lacked power, because of the Treaty, to subject the vessel to our laws. To hold that adjudication may follow a wrongful seizure would go far to nullify the purpose and effect of the Treaty.* Compare United States v. Rauscher, 119 U.S. 407, [7 S.Ct. 234, 30 L.Ed. 425]." 288 U.S. at 121–122 (emphasis supplied).

See also United States v. Ferris, 19 F.2d 925 (N.D.Cal.1927); United States v. Schouweiler, 19 F.2d 387 (S.D.Cal.1927).

Thus *Ker* does not apply where a defendant has been brought into the district court's jurisdiction by forcible abduction in violation of a treaty. See Ford v. United States, 273 U.S. 593, 605–606, 47 S.Ct. 531, 71 L.Ed. 793 (1927) (Ker v. Illinois is "inapplicable where a treaty of the United States is directly involved. . . ."). The rule in *Cook* is consistent with the traditional doctrine that "the construction of treaties is judicial in its nature, and courts when called upon to act should be

careful to see that international engagements are faithfully kept and observed. . . .," see Sullivan v. Kidd, 254 U.S. 433, 442, 41 S.Ct. 158, 162, 65 L.Ed. 344 (1921), and "that the Executive lives up to our international obligations," Shapiro v. Ferrandina, 478 F.2d 894, 906 n.10 (2d Cir. 1973). It derives directly from the Court's earlier decision in United States v. Rauscher, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1888), decided the same day as *Ker* and written by the same Justice. In *Rauscher*, the Court held that United States courts were barred from trying a fugitive, surrendered by Great Britain pursuant to a treaty of extradition, for a crime other than that for which he had been extradited, at least until he had been afforded an opportunity to return to the country from which he had been brought. In reaching this result the Court rejected the argument that even where a trial might be in violation of a treaty obligation, the defendant's exclusive remedy was an "appeal to the executive branches of the treaty governments for redress." See 119 U.S. at 430–432. See also Johnson v. Browne, 205 U.S. 309, 27 S.Ct. 539, 51 L.Ed. 816 (1907).

The government's reliance on United States v. Sobell, 244 F.2d 520 (2d Cir.), cert. denied, 355 U.S. 873, 78 S.Ct. 120, 2 L.Ed.2d 77 (1957), is misplaced. In that case, as in *Ker*, the only treaty relied on by Sobell, who claimed he had been abducted into the United States from Mexico by Mexican police acting without authority from their government but at the behest of United States government agents, was the existing extradition treaty between the United States and Mexico, 31 Stat. 1818. Relying solely on the extradition treaty, Sobell argued that *Ker* was distinguishable since there the illegal abduction was accomplished by an individual, the Pinkerton agent, who was acting in a purely private capacity whereas in his (Sobell's) case the illegal abduction was accomplished by persons who at the time of the kidnapping were acting as agents of the United States Government.[8] However, we concluded that, even assuming the truth of these allegations, the extradition treaty with Mexico had not been violated any more than the treaty with Peru in *Ker*, United States v. Sobell, 244 F.2d 520 at 525.

United States v. Cotten, 471 F.2d 744 (9th Cir. 1973), is also clearly distinguishable. Although the appellants there were forcibly returned from the Republic of Viet Nam to face criminal charges in the United States, the Vietnamese authorities, after disposing of pending charges by their government against appellants, relinquished custody to United States officials who transported them to Hawaii. Furthermore as the court noted "The United States does not have an extradition treaty with the Republic of Viet Nam," 471 F.2d at 745. Thus the transportation of the appellants there to the United States did not violate international law or an international treaty.

*The Allegation of Unlawful Wiretapping*

■ With respect to Toscanino's request pursuant to 18 U.S.C. § 3504 for a statement from the government affirming or denying the occurrence of an "unlawful act" in the form of eavesdropping or surveillance on the part of agents of the United States Government in Uruguay, we agree with the government that the federal statute governing wiretapping and eavesdropping, 18 U.S.C. § 2510, et seq., has no application outside of the United States. The term "wire communication," as used in the statute, 18 U.S.C. § 2510(1), is intended to refer to communications "through *our Nation's* communications network." See 1968 U.S. Code Cong. & Admin. News, 90th Cong., 2d Sess. p. 2178 (emphasis added). In prescribing the procedures to be followed in obtaining a wiretap authorization, see 18 U.S.C. § 2518, the statute significantly makes no provision

8. Appellant's Brief on Supplementary Motion, United States v. Sobell, 244 F.2d 520 (2d Cir.), cert. denied, 355 U.S. 873, 78 S.Ct. 120, 2 L.Ed.2d 77 (1957).

for obtaining authorizations for a wiretap in a foreign country.

Section 3504, however, is not satisfied merely by showing the inapplicability of our federal wiretap law. Section 3504(b) defines an "unlawful act" as including "any act—in violation of the Constitution." The government concedes that the Fourth Amendment functions independently of the statute. Compare Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), with Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The question to be resolved, therefore, is whether it applies under the circumstances of this case.

■ That the Bill of Rights has extraterritorial application to the conduct abroad of federal agents directed against United States citizens is well settled. Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (Fifth and Sixth Amendments); Balzac v. Puerto Rico, 258 U.S. 298, 312–313, 42 S.Ct. 343, 66 L.Ed. 627 (1922) (due process); Best v. United States, 184 F.2d 131, 138 (1st Cir.), cert. denied, 340 U.S. 939, 71 S.Ct. 480, 95 L.Ed. 677 (1950) (Fourth Amendment.) [9] The government, however, while not denying that American citizens may invoke the Fourth Amendment against unreasonable searches and seizures conducted by our government beyond the continental limits of the United States, contends that such rights are not available to aliens who are the victims of such conduct. We disagree. Like the Fifth Amendment guarantee of due process, the Fourth Amendment refers to and protects "people" rather than "areas," Katz v. United States, supra at 353, or "citizens," compare United States v. Pink, 315 U.S. 203, 228, 62 S. Ct. 552, 86 L.Ed. 796 (1942), and Rus-

sian Volunteer Fleet v. United States, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473 (1931); with Au Yi Lau v. United States Immigration and Naturalization Service, 144 U.S.App.D.C. 147, 445 F. 2d 217, cert. denied, 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971). "The Constitution of the United States is in force . . . whenever and wherever the sovereign power of that government is exerted," Balzac v. Puerto Rico, supra at 312–313. It is beyond dispute that an alien may invoke the Fourth Amendment's protection against an unreasonable search conducted in the United States. Au Yi Lau v. United States Immigration & Naturalization Serv., supra at 223. No sound basis is offered in support of a different rule with respect to aliens who are the victims of unconstitutional action abroad, at least where the government seeks to exploit the fruits of its unlawful conduct in a criminal proceeding against the alien in the United States. It is no answer to argue that the foreign country which is the situs of the search does not afford a procedure for issuance of a warrant. As the court pointed out in Best v. United States, supra at 138:

"Obviously, Congress may not nullify the guarantees of the Fourth Amendment by the simple expedient of not empowering any judicial officer to act on an application for a warrant. If the search is one which would otherwise be unreasonable, and hence in violation of the Fourth Amendment, without the sanction of a search warrant, then in such a case, for lack of a warrant, no search could lawfully be made." 184 F.2d at 138

Even if a more relaxed interpretation were given to the term "unreasonable" as applied to an unauthorized search

9. The Constitution, of course, applies only to the conduct abroad of agents acting on behalf of the United States. It does not govern the independent conduct of foreign officials in their own country. Birdsell v. United States, 346 F.2d 775, 782 (5th Cir.) (per Friendly, C. J., sitting by designation), cert. denied, 382 U.S. 963, 86 S.

Ct. 449, 15 L.Ed.2d 366 (1965). Whether or not United States officials are substantially involved, or foreigners are acting as their agents or employees, is a question of fact to be resolved in each case. Stonehill v. United States, 405 F.2d 738, 743–745 (9th Cir. 1968).

conducted by our government in Uruguay, appellant alleges that the search here was found to have violated the laws of that country, resulting in the arrest and conviction of the Uruguayan telephone employee hired by the United States Government for unlawful eavesdropping.

■ Since appellant here alleges that he was the victim of unlawful wiretapping conducted at the direction of United States employees in violation of his constitutional rights, he was entitled to invoke 18 U.S.C. § 3504. The district court was obligated to direct the prosecutor to put his oral denial of the allegation in affidavit form, indicating which federal agencies had been checked and extending the denial not only to conversations of Toscanino but also to conversations of anyone else occurring on premises owned, leased or licensed by Toscanino. See Beverly v. United States, 468 F.2d 732 (5th Cir. 1972); In re Horn, 458 F.2d 468 (3d Cir. 1972); In re Grumbles, 453 F.2d 119 (3d Cir.), cert. denied, 406 U.S. 932, 92 S.Ct. 1806, 32 L.Ed.2d 134 (1971); In re Marx, 451 F.2d 466 (1st Cir. 1971). In the absence of such sworn written representations we are unable to affirm the denial of a hearing on Toscanino's wiretap allegations. Cf. In re Evans, 146 U.S.App. D.C. 310, 452 F.2d 1239 (1971), cert. denied, 408 U.S. 930, 92 S.Ct. 2479, 33 L. Ed.2d 342 (1972) (18 U.S.C. § 3504 is triggered by mere assertion that unlawful wiretapping has been used against a party).

### Conclusion

The case is remanded to the district court for further proceedings not inconsistent with this opinion. Our remand should be construed as requiring an evidentiary hearing with respect to Toscanino's allegations of forcible abduction only if, in response to the government's denial, he offers some credible supporting evidence, including specifically evidence that the action was taken by or at the direction of United States officials. Upon his failure to make such an offer

the district court may, in its discretion, decline to hold an evidentiary hearing. Cf. Russo v. United States, 404 U.S. 1209, 92 S.Ct. 4, 30 L.Ed.2d 13 (Douglas, J., sitting as a circuit judge).

ROBERT P. ANDERSON, Circuit Judge (concurring in result):

I concur in the result.

My concurrence is so limited because this case can be disposed of on due process grounds alone. Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). The majority opinion well establishes that if the defendant is successful in proving what he has alleged about the highly irregular activities of the Federal agents, this court is not going to sanction or validate them by affirming the conviction of the defendant. United States v. Archer, 486 F.2d 670 (2 Cir. 1973). The courts of this country, in dealing with cases before them, no longer completely disregard the behavior of our police agents when they are operating outside of the national boundaries.

To reach this conclusion, however, this court need not hold that the Bill of Rights has extraterritorial application for foreign nationals. Defendant could show that he was carried into this jurisdiction in violation of the Fourth Amendment, but the Government need not comply with the Fourth Amendment or the United States wire tap laws in foreign jurisdictions. To hold otherwise would be novel and would make unreasonable demands on our foreign agents, whether in law enforcement or national security, who by following the law of the country in which they are staying, could at the same time find themselves in defiance of United States constitutional safeguards.

Further, defendant did not enter this country pursuant to any treaty; he is, therefore, not "clothed" in any treaty rights and cannot invoke the extradition treaty or the charters of the Organization of American States and the United Nations as personal defenses, United States v. Sobell, 142 F.Supp. 515 (S.D. N.Y.1956) (Kaufman, Judge), aff'd 244

F.2d 520 (2 Cir.), cert. den. 355 U.S. 873, 78 S.Ct. 120, 2 L.Ed.2d 77 (1957). Violation of the standards laid down by these treaties is again indicative of the denial of due process, but not a defense in and of itself.  By and large treaties are to be enforced by governments, rather than by their individual citizens, and neither the United States, Uruguay nor Brazil contemplated that, under these circumstances, a defendant could personally seek to invoke these treaties.