**UNITED STATES of America**

**v.**

**Stanley LAWRENCE, Defendant.**

**Crim. No. 76–593.**

United States District Court,
District of Columbia.

June 27, 1977.

**442**

Earl J. Silbert, U. S. Atty., Washington, D. C., Daniel DeRose, Asst. U. S. Atty., Washington, D. C., for United States.

Roger E. Zuckerman, Roger C. Spaeder, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

WADDY, District Judge.

This case is before the Court on motions of the defendant to suppress evidence and to dismiss the indictment. The motions raise two questions: (1) whether there was probable cause for the warrantless arrest of defendant on narcotics charges; and (2) whether the arrest was effected by such extreme official brutality that the indictment should be dismissed.

At a hearing on the motions relevant testimony was given by the two arresting police officers, the defendant and a by-stander witness.

On July 20, 1976, Officer Vance L. Beard, a police investigator assigned to the Fifth District Vice Unit, Narcotics Section, of the Washington, D. C. Metropolitan Police Department, arranged a meeting with an unidentified informant for the purpose of developing the informant's reliability so that the informant might be used for search warrant purposes in the future.[1] At approximately 9:30 p. m. that evening, Officer Beard and his partner, Officer Anthony J. Zgainer, also assigned to the Fifth District, while on duty, met with the informant on Martin Luther King Avenue, Southeast. Officer Beard was seeking information about drug activities within the Fifth District which is geographically located largely in Northeast Washington.[2] However, the informant took the officers to the Third District which is geographically located in Northwest Washington. The informant did not reside in the Third District.[3]

Although the Third District was outside his area of geographic responsibility, Officer Beard, accompanied by Officer Zgainer, transported the informant into the Third District in his privately-owned, unmarked vehicle, to the vicinity of 14th and Swann Streets, Northwest,[4] arriving at approximately 10:00 p. m. Neither Officer Beard nor Officer Zgainer notified their superiors in the Fifth District that they were leaving their District for operations in the Third District, nor did they notify anyone in the Third District that they were operating undercover in that District.[5]

Upon their arrival in the vicinity of 14th and Swann Streets, Northwest, the informant left the officers. The informant returned about thirty minutes later and related to them the information that they relied upon for the arrest of Stanley Lawrence, the defendant in this case. According to Officer Beard's testimony, the informant told them that a man, known to the source as "Stan" or "Stanley", a Negro male of heavy build, wearing maroon pants, a striped sport coat and sunglasses, was selling narcotics from his pocket at 14th and T Streets, Northwest, and that a narcotics sale had been observed.[6] Officer Zgainer testified that the informant described the suspect as ". . . a Negro male, approximately 6–foot, very ‑ heavy, possibly even . . . fat." Further, that "he had on maroon pants with a matching ma-

---

1. Tr. 26, 27, Feb. 22, 1977.

2. Tr. 18.

3. Tr. 20, 21.

4. Tr. 18, 21, 23.

5. Tr. 20, 66.

6. Tr. 7, 8.

roon checkered, or striped coat and that he, also, was wearing shades."[7]

Immediately upon receipt of the above information the officers left 14th and Swann Streets, Northwest, and proceeded up 14th Street toward T Street, Northwest, with Officer Beard at the wheel of his vehicle. Both officers were dressed in casual street clothes. The informant did not accompany them and no arrangement was made to have the informant signal the officers to further identify the suspect at the scene.

At the intersection of 14th and T Streets, Northwest, Officer Zgainer, from about 60 feet away,[8] observed an individual matching the suspect's description standing on the north side of the 1300 block of T Street, Northwest, approximately 10 yards east of the intersection of 14th Street, Northwest.[9] Officer Beard testified that the suspect was walking *towards* 14th Street.[10] Approximately 30 to 50 people were gathered and mingling in the general vicinity.[11] The suspect was standing slightly apart from the crowd, although there were several other individuals near him. There were people on all four corners of 14th and T Streets, Northwest.

Officer Beard proceeded northward across T Street, then executed a U–turn on 14th Street, proceeded southward and turned left onto T Street, headed in an easterly direction. Because of the large crowd in the area, Officer Zgainer notified the radio dispatcher they were going to make an arrest and requested backup assistance. They did not, however, wait for the backup to arrive.

Officer Beard stopped his vehicle on the south side of T Street. Officer Zgainer immediately jumped out, moved around the rear of the car and hastened directly toward the suspect. Upon seeing Officer Zgainer heading toward him, the defendant began walking away. Officer Zgainer ran after the suspect and attempted to place him under arrest. A struggle ensued. Officer Zgainer testified that as he approached the defendant he yelled "Freeze, Police."[12] The defendant denied this testimony and stated that the officers never indicated verbally or in any other manner that they were policemen.[13] Officer Beard also alighted from his vehicle and, upon reaching the location of the scuffle, grabbed the suspect's right arm. Officer Zgainer, who was behind and to the left of the suspect, was holding the suspect's left arm. The testimony indicates that the suspect's right hand was either in the front waistband of his pants or in his right jacket pocket. Both officers testified that they believed the suspect was trying to conceal narcotics.[14] During the struggle Officer Zgainer shot the defendant in the back, using his service gun loaded with unauthorized hollow-point ammunition rather than the standard required 158 grain labeled ammunition.[15]

Also, during the struggle, it was discovered that the defendant possessed a gun. Both officers testified that the defendant had his weapon in his right hand. However, their statements and demonstrations at the hearing relating to the defendant's right arm position and the direction in which the gun was pointed are entirely inconsistent.[16] The defendant testified that

7. Tr. 45.

8. Tr. 46.

9. Tr. 47, 48.

10. Tr. 42.

11. Tr. 31, 39, 40, 50.

12. Tr. 53.

13. Tr. 73, 81, 82.

14. Tr. 12, 55.

15. Tr. 67.

16. Testimony of Officer Beard, Tr. 36, 37:

Q  You indicated there was a time when Mr. Lawrence had his hand free with the pistol in it, is that true?  .  .  .
A  That's true.
Q  That's the right hand, am I right?
A  Right.
Q  And that was not pointed at you, was it, at that time?
A  When I first felt it?
Q  At the moment he took it out, it was not pointed at you, was it?

the gun was in his right pants' pocket; that he never removed it from that pocket; that an officer removed it from that pocket while patting him down and "placed it on the ground in front of me, then he said, 'He's got a gun.'" The defendant testified that it was at that time the officer shot him.[17] He further testified that he had some five or six bags of narcotics in his right coat pocket; that he never took his hand out of his right coat pocket; and never held the gun in his hand.[18]

A search of the defendant's person produced seven packets of a substance identified as heroin, recovered from his right front sport coat pocket. The accused was taken by ambulance to a nearby hospital where an additional two packets of drugs were allegedly found on his person. As a result of the shooting, Stanley Lawrence is permanently paralyzed in the lower two-thirds of his body. The nine packets of drugs, together with the gun, are the subject of his motion to suppress.

### Probable Cause for Arrest

■ When the validity of a warrantless arrest is challenged, the Court must determine whether the facts and circumstances within the knowledge of the arresting officers, and of which they had reasonably trustworthy information, were "sufficient in themselves to warrant a man of reasonable caution in the belief" that a crime has been committed by the person arrested. *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925).

■ Where information leading to the arrest has been supplied by an unidentified informant, the Court must apply a two prong test to determine whether the Constitutional demands for probable cause have been met. First, the Court must determine if the arresting officer was sufficiently informed of some of the underlying circumstances from which the informant's conclusion [that narcotics were where he claimed they were] was reached. Second, the Court must inquire into the underlying circumstances from which the arresting officer concluded the informant was credible or the information was reliable. *Aguilar v. Texas,* 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The probable cause standards developed in *Aguilar* and other search and seizure cases are fully applicable to a warrantless arrest inquiry. *McCray v. Illinois,* 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); *Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).

Or, as the Court of Appeals for this Circuit stated in *United States v. Carter,* 162 U.S.App.D.C. 132, 498 F.2d 83 (1974):

An evaluation of the trustworthiness of an informant's tip requires two inquiries—one focusing upon the credibility of the informant himself and one focusing upon the validity of his conclusion that the arrestee has committed a crime. 498 F.2d at 85.

Turning first to whether the tip contained sufficient information concerning the underlying circumstances to support the conclusion a crime had taken place, the

A  At the moment he took it out, no.
Q  And it was never pointed at Zgainer, was it?
A  Yes, it was.
Q  It's your testimony that he pointed the gun at Zgainer?
A  In a manner like this [demonstrating], yes.
   MR. SPAEDER.  The record will reflect that the witness has held his arm, more or less, straight up. [Addressing witness]  Which way was the barrel pointed?
   WITNESS: In the direction of where Zgainer was behind me.
   BY MR. SPAEDER:
Q  Toward the air, is that correct, towards the sky?

A  He was trying—At the moment the shot went off, the gun was tilted back towards Zgainer.
Testimony of Officer Zgainer, Tr. 57:
   [Continuing]  At that point, I stepped back and Officer Beard—I observed Officer Beard grab the defendant's right hand.  When Officer Beard grabbed the defendant's right hand, the defendant pulled his left hand, which is free and pointed the gun—pushed the gun towards Officer Beard's abdomen and at that point in fear of, you know, my partner's life and my own, I fired one round at the defendant.

17.  Tr. 73.

18.  Tr. 73, 74.

Court notes that while the testimony indicates the informant related an alleged *personal observation* of an illegal narcotics transaction and gave the officers a fairly accurate description of Stanley Lawrence and his clothing, other corroborative information is lacking. For instance, the informant knew only the defendant's first name. The record does not reveal that the informant and the defendant were personally acquainted. Nor does it reveal that the source had any prior knowledge of the subject or his activities, or when or where the suspect's first name was learned. The informant gave a generally accurate physical description of Stanley Lawrence, his clothing, the general area of the location, and told the officers Lawrence "was selling narcotics from the area of his pocket." The source did not disclose on which corner of 14th and T the narcotics transaction had been observed, how it was known that what was allegedly observed was a sale of narcotics, how close the informant was to the transaction, or when the transaction took place, although the testimony suggests the sale had taken place no more than 30 minutes before the tip was given to the arresting officers.

Since the arresting officers had no independent knowledge and there was very little in the way of other corroboration, the credibility of the informant himself becomes critical. Compare, *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and *United States v. Harris* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

■ With regard to this prong of the *Aguilar* test, "[t]he burden of the Government is to show facts and circumstances from which the officers could reasonably conclude that the informant was credible". *United States v. Carter, supra,* 498 F.2d at 85.

Officer Beard testified he had spoken with the informant on three different occasions during the one month period preceding the arrest of Stanley Lawrence. The informant had, at those times, given him something more than general information relating to narcotics distributors in Washington, D. C., descriptions of cars driven by them, runners working for them, and the distributors modes of operation. Officer Beard testified that all of this previous information had been verified as being correct. However, he did not reveal how the information was tested or verified. No arrests had ever been made on the basis of this informant's information, no warrants had been issued, and no immediate action of any kind had ever been taken as a result of information supplied by this particular source. The informant was a new source with only a brief, somewhat general and very recent track record not previously relied upon by the police. Contact with the informant had been made that evening specifically for the purpose of establishing the informant as a reliable source for future police use.

Moreover, the only independent corroboration of the informant's present information was the officers' observations of a person meeting the general description of the defendant, near the general location of the alleged offense. The arrest was made in a district to which Officers Beard and Zgainer were not assigned, in which the informant did not live, and in which the officers were operating without prior notification to, or approval of, their superiors.

■ Considering all of the foregoing this Court concludes that the tip of the informant did not sufficiently state the underlying circumstances and facts to support the conclusion that Stanley Lawrence was selling narcotics from his pocket at 14th and T Streets, Northwest. Nor has the Government shown "facts and circumstances from which the officers could reasonably conclude the informant was credible." *United States v. Carter, supra,* 498 F.2d at 85. Accordingly, probable cause for the warrantless arrest of Stanley Lawrence did not exist and the evidence seized must be suppressed.

### Police Brutality

Defendant has also moved the Court to dismiss the indictment for extreme police brutality. He argues that his arrest was characterized by such extreme inhuman and outrageous official brutality that his due process rights were violated and that this Court's criminal process would be abused and degraded if he is prosecuted under this indictment.

The Supreme Court of the United States has enunciated in *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1888) and *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), the rule that a court's jurisdiction may not be defeated because of the manner in which the defendant is brought before the Court. Defendant relies primarily upon an exception to this rule carved out by the Second Circuit in *United States v. Toscanino,* 500 F.2d 267 (2nd Cir. 1974). In that case the defendant had been kidnapped from Uruguay, severely tortured and incessantly interrogated. The Court in ordering an evidentiary hearing stated that due process requires a court

> . . . to divest itself of jurisdiction over the person of the defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights. The conclusion represents but an extension of the well-recognized power of federal courts in the civil context to decline to exercise jurisdiction over a defendant whose presence has been secured by force or fraud. 500 F.2d at 275.

Such a departure from the so-called *Ker-Frisbie* general rule was foreshadowed by the Supreme Court, for example in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) wherein the Court, citing *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), observed

> . . . we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking

judicial process to obtain a conviction . . . . 411 U.S. at 431–432, 93 S.Ct. at 1643.

The facts adduced from the testimony given at the hearing on defendant's motions regarding the circumstances of the shooting are as follows: that the general vicinity of the arrest is known as a high crime area; that a substantial number of people were milling about 14th and T Streets, Northwest at the time of the shooting; that the defendant walked away when he saw Officer Zgainer jump from the unmarked car and directly approach him; that Officer Zgainer ran after the accused and grabbed him from behind; that a struggle ensued, ultimately involving both officers, during which the officers allegedly identified themselves as police officers and Officer Beard shouted a warning to his partner that the suspect had a gun; and that the incapacitating shot was fired by Officer Zgainer from behind the defendant and into his back immediately following that warning.

Both officers testified they saw the gun in the defendant's right hand during the scuffle. As indicated above, defendant's testimony substantially conflicts with that of the two officers on this, as well as several other important factual questions.

Although it does appear to this Court that the shooting of the defendant in the back at close range by Officer Zgainer using unauthorized ammunition, while he and Officer Beard were both holding the defendant's hands was unnecessary and unreasonable, it did occur during a struggle between the officers and the defendant and was not "so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction."

Accordingly, it is by the Court this 27th day of June, 1977,

ORDERED, that defendant's motion to suppress be, and the same hereby is, granted, and that all evidence acquired as a result of the arrest hereinabove found unlawful be, and the same hereby is, suppressed, and it is

FURTHER ORDERED, that defendant's motion to dismiss the indictment for police brutality be, and the same hereby is, denied.