# Extraterritorial Apprehension by the Federal Bureau of Investigation

In the absence of an international law violation, a federal district court will not ordinarily divest itself of jurisdiction in a criminal case where the defendant's presence has been secured by his forcible abduction from the territorial limits of a foreign asylum state.

A forcible abduction, when coupled with a protest by the asylum state, is a violation of international law; there is, however, some precedent that complicity of asylum state officials in the abduction could be the predicate for a finding of no actual violation of the asylum state's sovereignty.

Civil liability on the part of the United States or participating government officials resulting from a fugitive's forcible apprehension in a foreign country will depend on the status of the operation under international law; liability could be predicated on theories of constitutional or common law tort, or on a violation of international law.

The Federal Bureau of Investigation has no authority to apprehend and abduct a fugitive residing in a foreign state without the asylum state's consent.

In the absence of asylum state consent, federal officials may be subject to extradition to the asylum state for kidnapping.

March 31, 1980

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

You have requested that this Office advise you on the implications of a proposed operation of the Federal Bureau of Investigation (FBI) that might entail entry of American agents into a foreign country and forcible apprehension of a fugitive currently residing there. It is to be assumed that the foreign country (hereinafter "asylum state") would file a pro forma protest to the fugitive's apprehension and return to the United States. We also assume that the actual apprehension would be made by FBI agents, although some elements of the local police force might provide physical surveillance and aid in the neutralization of bodyguards during the actual apprehension.

The proposed operation raises the following, interrelated legal issues: the implications of the seizure for the pending criminal prosecutions of the fugitive, the legal status of the operation under existing treaties and settled principles of international law, and the possibility of civil liability on the part of the United States or participating government officials. This operation is unorthodox and, therefore, prompts a number of legal questions that are of first impression. Although we will discuss all the above legal questions separately, we think that the fundamental

legal issue presented by this operation is under what circumstances does the FBI, as a matter of United States law, have the authority to make an extraterritorial apprehension. Although the question is not free from doubt, we conclude that the FBI only has lawful authority when the asylum state acquiesces to the proposed operation. Since we are to assume that a pro forma protest to the operation would be filed, that fundamental condition would probably not be satisfied here.

## I. Implications for Criminal Prosecutions of Extraterritorial Apprehension that Is Subject of Protest

The Supreme Court has consistently stated "that the power of a court to try a person for crime is not impaired by the fact that he [has] been brought within the court's jurisdiction by reason of a 'forcible abduction.'" *Frisbie* v. *Collins,* 342 U.S. 519, 522 (1952).[1] It has rejected arguments that such abductions constitute violations of the Due Process Clause, and has reiterated the vitality of this conclusion in a recent Term. *Gerstein* v. *Pugh,* 420 U.S. 103, 119 (1975). Lower courts, particularly the Court of Appeals for the Second Circuit, have suggested, however, that under some circumstances a federal court might divest itself of jurisdiction as a result of the manner in which the defendant was brought before it.

The most sweeping statement of these circumstances is to be found in *United States* v. *Toscanino,* 500 F.2d 267 (2d Cir. 1974). There the Second Circuit confronted allegations that Toscanino, a citizen of Italy, was kidnapped in Uruguay by agents in American employ, tortured and interrogated for 17 days in Brazil with the knowledge of and sometimes in the presence of United States officials, and finally drugged and put on a commercial flight to the United States where he was convicted of narcotics violations.[2] Questioning the current vitality of the *Ker-Frisbie*

---

[1] These propositions are often referred to as the *Ker-Frisbie* doctrine. In the leading case, *Ker* v. *Illinois,* 119 U.S. 436 (1886), Ker was convicted in the Illinois state courts after being forcibly abducted in Peru. Formal extradition had been arranged among the Governor of Illinois, the U.S. Secretary of State, and Peruvian officials, but the individual who was sent to accompany Ker back to the United States did not present the extradition papers upon arrival in Peru. It was therefore a "clear case of kidnapping within the confines of Peru." *Id.* at 443. Although the apprehending agent might be subject to criminal prosecution in Peru, the Court found that American law afforded the apprehended fugitive no protection.

*Frisbie* v. *Collins,* 342 U.S. 519 (1952), involved an interstate abduction. Michigan officers forcibly seized Collins in Chicago. Acknowledging that the Michigan officers might be subject to prosecution under the Federal Kidnapping Act, the Court held that as far as Collins was concerned, "due process of law is satisfied when one present in Court is convicted of crime after having been fairly apprised of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will." *Id.* at 522. *See also Mahon* v. *Justice,* 127 U.S. 700, 708 (1888).

[2] Toscanino alleged that he was denied sleep and nourishment for days, fed intravenously at survival levels, forced to walk for hours on end, and kicked and beaten. He claimed his fingers were pinched by metal pliers; his eyes, nose, and anus washed in alcohol; and his genitals subjected to electric shock. There had been no attempt by the United States to extradite Toscanino. *Toscanino,* 500 F.2d at 270.

doctrine, the Second Circuit relied on *Rochin* v. *California,* 342 U.S. 165 (1952), in concluding that the concept of due process has evolved such that a court must now "divest itself of jurisdiction over the person where it has been acquired as the result of the Government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights." 500 F.2d at 275.[3] If on remand Toscanino's allegations were proven true, the Second Circuit saw a due process violation inherent in the bribery of a foreign official, the violence and brutality of the abduction, the violations of international law, and the failure to attempt extradition of Toscanino.[4]

Subsequent Second Circuit cases have read *Toscanino* narrowly and other circuits have refused to follow it. In *United States ex rel. Lujan* v. *Gengler,* 510 F.2d 62 (2d Cir.), *cert. denied,* 421 U.S. 1001 (1975), the Second Circuit emphasized that *Toscanino* did not mean that "*any* irregularity in the circumstances of a defendant's arrival in the jurisdiction could vitiate the proceedings of the criminal court," but rather was concerned with the "cruel, inhuman and outrageous treatment" that Toscanino allegedly received.[5]

Thus the court concluded that although Lujan was forcibly abducted from Bolivia, the lack of any allegation of the type of "shocking governmental conduct" involved in *Toscanino* obviated any application of the rationale of that case. *Lujan,* 510 F.2d at 66.[6] It did, however, reserve the question whether the fact that an abduction is in violation of international law requires dismissal of the criminal indictment: either because such illegal governmental conduct constitutes a violation of due process or because a federal court should, as a matter of judicial administration, refuse to be a party to official misconduct. *Id.* at 68.[7] The court perceived no international law violation in *Lujan* because there had been no protest by the foreign governments involved. *Id.* at 67.

Other circuits have resolutely invoked the *Ker-Frisbie* doctrine to dismiss arguments that American courts should divest themselves of their criminal jurisdiction over a defendant because his presence was

---

[3] The court did not have the benefit of the Supreme Court's endorsement in *Gerstein* v. *Pugh,* 420 U.S. at 119, of the *Ker-Frisbie* doctrine.

[4] The court of appeals noted that even if the *Ker-Frisbie* doctrine was still good law, it could make use of its supervisory power over the district court to upset Toscanino's conviction in order "to prevent district courts from themselves becoming 'accomplices in willful disobedience of law.'" *Toscanino,* 500 F.2d at 276, quoting *McNabb* v. *United States,* 318 U.S. 332, 345 (1943). On remand the district court found that Toscanino's allegations had no basis in fact. *United States* v. *Toscanino,* 398 F. Supp. 916 (E.D. N.Y. 1975).

[5] 510 F.2d at 65 (emphasis in original). *See also United States* v. *Lira,* 515 F.2d 68 (2d Cir.), *cert. denied,* 423 U.S. 847 (1975) (*Toscanino* distinguished because no direct United States involvement in torture by Chilean police).

[6] Lujan, a licensed pilot, alleged that while residing in Argentina, he was hired by an individual to fly to Bolivia. He claimed that his employer was in fact paid by American agents to lure Lujan out of Argentina. In Bolivia, Lujan was arrested by Bolivian police who were also allegedly paid by American agents. He was ultimately put on a plane by Bolivian and American agents and formally arrested upon his arrival in the United States. *Lujan,* 510 F.2d at 63.

[7] *See supra,* note 4.

545

procured through a forcible abduction.[8] Moreover, a number of those courts have suggested that jurisdiction should be retained even if the abduction violates international law.[9] We note, however, that there is apparently no reported case where the abduction was the subject of a formal diplomatic protest by the asylum state.

It is our opinion that even where an abduction is a technical violation of international law, a federal district court should not divest itself of jurisdiction over the fugitive's criminal prosecution.[10] We think this position is dictated by logic and precedent. In *Frisbie,* 342 U.S. 522, the Supreme Court assumed that the conduct of the Michigan authorities who abducted Collins from Chicago constituted a violation of the Federal Kidnapping Act. It concluded, however, that the Kidnapping Act "cannot fairly be construed so as to add to the list of sanctions detailed a sanction barring a state from prosecuting persons wrongfully brought to it by its officers. It may be that Congress could add such a sanction. We cannot." *Frisbie,* 342 U.S. at 523. A dismissal remedy for a violation of international law is even less appropriate. The interests protected by international law are those of sovereign nations. Any interest of individuals is at best derivative. *See Lujan,* 510 F.2d at 67. By contrast, the Federal Kidnapping Act is unquestionably for the protection of individuals; yet under the principles of *Frisbie,* a forcible

---

[8] *E.g., United States* v. *Postal,* 589 F.2d 862, 865 (5th Cir.), *cert. denied,* 444 U.S. 832 (1979) (arrest by Coast Guard upon the high seas); *United States* v. *Marzano,* 537 F.2d 257, 271–72 (7th Cir. 1976), *cert. denied,* 429 U.S. 1038 (1977) (allegations of unlawful arrest in and forcible abduction from Grand Cayman Island; *Toscanino* characterized as only departure from *Ker-Frisbie* doctrine); *Waits* v. *McGowan,* 516 F.2d 203 (3d Cir. 1975) (allegedly illegal removal from Canada to New York); *United States* v. *Cotten,* 471 F.2d 744, 747–49 (9th Cir.), *cert. denied,* 411 U.S. 936 (1973) (forcible removal from Vietnam).

There is a standard formulation of the *Ker-Frisbie* doctrine reiterated in these cases:

It has long been held that due process has been satisfied when a person is apprised of the charges against him and is given a fair trial. The power of a court to try a person is not affected by the impropriety of the method used to bring the defendant under the jurisdiction of the court [citing *Ker* and *Frisbie*]. Once the defendant is before the court, the court will not inquire into the circumstances surrounding his presence there.

*United States* v. *Marzano,* 537 F.2d at 271.

[9] *E.g., Postal,* 589 F.2d at 873 ("This proposition, the so-called *Ker-Frisbie* doctrine, is equally valid where the illegality results from a breach of international law not codified in a treaty"); *United States* v. *Cadena,* 585 F.2d 1252, 1261 (5th Cir. 1978) *United States* v. *Winter,* 509 F.2d 975, 984–86 (5th Cir.), *cert. denied,* 423 U.S. 825 (1975) (*Ker-Frisbie* doctrine makes it unnecessary to inquire whether arrest by Coast Guard within territorial waters of Bahamas violated international law); *Autry* v. *Wiley,* 440 F.2d 799, 802–03 (1st Cir.), *cert. denied,* 404 U.S. 886 (1971).

Oftentimes courts simply do not discuss the status of the abduction under international law. *E.g., Marzano,* 537 F.2d 257; *United States* v. *Herrera,* 504 F.2d 859 (5th Cir. 1974); *United States* v. *Vicars,* 467 F.2d 452 (5th Cir. 1972), *cert. denied,* 410 U.S. 967 (1973).

[10] *Cadena,* 585 F.2d at 1261 ("no basis for concluding that violations of these international principles must or should be remedied . . . by dismissal of the indictment unless Fourth Amendment interests are violated"); *Autry* v. *Wiley,* 440 F.2d at 801–02; *see also Waits* v. *McGowan,* 516 F.2d 203, 208 (3d Cir. 1975) ("the protections or rights which accrue to the extradited person primarily exist for the benefit of the asylum nation . . ., whereas plaintiff's complaint alleges violation of rights of citizens of the demanding nation (The United States of America)").

American courts are charged with the vindication of international law principles to the extent those principles are consonant with American law. *The Paquete Habana,* 175 U.S. 677, 700 (1900). The thrust of the abduction cases is that relinquishing criminal jurisdiction is not the means to vindicate those principles.

abduction in violation of that Act does not divest an American court of jurisdiction.

In sum, we are of the opinion that in the absence of an international law violation, a federal district court will not ordinarily divest itself of jurisdiction in a criminal case where the defendant's presence has been secured by forcible abduction from the territorial limits of a foreign asylum state. Nor should it do so where there is an international law violation. However, since you have advised us that you expect a pro forma diplomatic protest by the asylum state and that the fugitive's prosecution will proceed in the Southern District of New York, it is necessary to examine the international law implications of this operation more closely. As we have noted, the Second Circuit has expressly reserved the question whether a violation of international law should result in relinquishment of criminal jurisdiction over the suspect.

## II. International Law Implications of the Proposed Operation

There is one line of authority in American jurisprudence that does create an exception to the *Ker-Frisbie* doctrine. As Congress by statute can modify the jurisdiction of federal courts, so too can a treaty. Thus the Supreme Court has held that a treaty can divest federal courts of jurisdiction in certain circumstances if such was the intent of the document. *Cook* v. *United States,* 288 U.S. 102, 112 (1933); *Ford* v. *United States,* 273 U.S. 593, 610–11 (1927). As the Fifth Circuit recently noted, for a treaty to have such an effect, it must be self-executing or implemented by statute.[11]

There are two arguably relevent treaties between the United States and the asylum state that must be considered in this case. They are the extradition treaty between the two countries and the United Nations Charter. It is well-established that the existence of an extradition treaty *simpliciter* does not defeat U.S. jurisdiction over a fugitive apprehended outside the extradition mechanism.[12] And there is nothing in the terms of the existing extradition treaty that suggests that this government has yielded jurisdiction over U.S. nationals who have committed crimes in this country simply because they obtained refuge in the asylum state.[13]

The second relevant treaty is the United Nations Charter to which both the United States and the asylum state are signatories.

---

[11] *Postal,* 589 F.2d at 875–76. A treaty does not provide rules of decision for American courts unless that is the intent of the document, *i.e.,* the treaty is self-executing. *Whitney* v. *Robertson,* 124 U.S. 190, 194 (1888); *Foster* v. *Neilson,* 27 U.S. (2 Pet.) 253, 314 (1829). Of course, implementing domestic legislation does provide rules of decision capable of judicial enforcement.

[12] *Ker,* 119 U.S. at 444 (1886); *Waits* v. *McGowan,* 516 F.2d at 206–08; *Lujan,* 510 F.2d at 66; *United States* v. *Sobell,* 244 F.2d 520, 524–25 (2d Cir.), *cert. denied,* 355 U.S. 873 (1957).

[13] By its terms it does not constitute an agreement that extradition will be the exclusive means of obtaining custody of a fugitive. Nor does it purport to limit the criminal jurisdiction of either sovereign.

547

> All Members shall refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any state, or in any other manner inconsistent with the Purposes of the United Nations.

U.N. Charter, art. 2, para. 4.

This provision has been at issue in a number of forcible abduction cases, including *Toscanino* and *Lujan.* The leading precedent on forcible abduction's status under the United Nations Charter is that involving the apprehension of Adolph Eichmann in Argentina by Israeli agents. Argentina objected to the United Nations Security Council, which subsequently adopted a resolution:

> Considering that the violation of the sovereignty of a Member State is incompatible with the Charter of the United Nations . . . [and n]oting that the repetition of acts such as that giving rise to this situation would involve a breach of the principles upon which international order is founded creating an atmosphere of insecurity and distrust incompatible with the preservation of peace . . . [the Security Council requests] the Government of Israel to make appropriate reparation in accordance with the Charter of the United Nations and the rules of international law.[14]

Commentators have construed this action to be a definitive construction of the United Nations Charter as proscribing forcible abduction in the absence of acquiescence by the asylum state.[15]

It is our opinion that even if the operation under consideration is construed to be a violation of the United Nations Charter, the criminal jurisdiction of American courts is unaffected. We base our opinion on the grounds that the United Nations Charter is not a self-executing treaty and that it was not intended by the United States at the time of ratification to affect the criminal jurisdiction of federal courts. There is not a great deal of case law on these points. However, as the Fifth Circuit observed in *Postal,* 589 F.2d at 876, the self-executing nature of a treaty is a matter of intent. The broad sweep and hortatory tone of Article 2 belies any argument that a binding, self-executing limitation on the criminal jurisdiction of American courts is evident in its terms.[16]

---

[14] Quoted in W. Bishop, International Law 475 n.52 (1962).

[15] *E.g., Lujan,* 510 F.2d at 66–68; Abramovsky & Eagle, *U.S. Policy in Apprehending Alleged Offenders Abroad: Extradition, Abduction, or Irregular Rendition?,* 57 Or. L. Rev. 51, 63 (1977); *see* Silving, *In re Eichmann: A Dilemma of Law and Morality,* 55 Am. J. Int'l L. 307 (1961).

[16] *See generally,* L. Goodrich, E. Hambro & A. Simmons, Charter of the United Nations: Commentary and Documents 43–55 (1969).

And courts that have considered provisions of the United Nations Charter have concluded that they are not self-executing.[17]

It is a more difficult question whether the proposed operation is a violation of general international law principles, albeit not a violation of a self-executing treaty. As Judge Kaufmann indicates in his majority opinion in *Lujan*, it appears to be the case that a forcible abduction, when coupled with a protest by the asylum state, is a violation of international law. *Lujan*, 510 F.2d at 67. It is regarded as an impermissible invasion of the territorial integrity of another state. Since the asylum state would hardly attest to the fact that the protest is pro forma, there is little to be gained in the instant case by characterizing it as such. Nor do there appear to be any doctrines of self-help or self-defense applicable in this context.

There may be, however, some precedent in international law for the argument that complicity of asylum state officials in the abduction robs the asylum state's protest of its import under international law. In 1911 the Permanent Court of Arbitration at The Hague declined to order the return to France of one Savarkar. Savarkar had escaped to France from a British ship, only to be returned to the British by a French policeman. The Court of Arbitration found that the French official's cooperation avoided any violation of French sovereignty that might otherwise have occurred.[18] Likewise, the complicity of the asylum state's police in the proposed operation could be the predicate for a finding of no actual violation of the asylum state's sovereignty. One obvious drawback to this argument is that it forces this government to put in issue the identity of its asylum state collaborators. We also note that the Court of Arbitration in the Savarkar case found that the British officials had no reason to know that the French official was not acting with the approval of the French government. No similar claim of ignorance could be made about the operation under consideration.

We conclude that the best assumption for purposes of analyzing the implications of the proposed operation is that although not a violation of a self-executing treaty, it would violate international law. That significantly heightens the litigation risks in the Second Circuit, which has explicitly declined to define the implications of an international law violation on criminal jurisdiction.

## III. Civil Liability

We think the case for obtaining at least the acquiescence of the asylum state is compelling when the criminal litigation risks are coupled

---

[17] *Sei Fujii* v. *State*, 242 P.2d 617, 620 (Cal. 1952) (human rights provisions of U.N. Charter not self-executing); *Pauling* v. *McElroy*, 164 F. Supp. 390, 393 (D.D.C.), *aff'd*, 278 F.2d 252 (D.C. Cir.), *cert. denied*, 364 U.S. 835 (1960) (finding other sections of Charter not self-executing).

[18] The case is discussed in *Lujan*, 510 F.2d at 67, and can be found at *Judicial Decisions Involving Questions of International Law*, 5 Am. J. Int'l L. 490, 520 (1911).

with the possibility of civil liability.[19] Civil liability will turn to a substantial degree on whether the FBI is authorized to conduct this operation and that, in our view, will depend on the status of the operation under international law.

In *Ker* v. *Illinois,* the penultimate paragraph in the Supreme Court's opinion reads as follows:

> It must be remembered that this view of the subject does not leave the prisoner or the Government of Peru without remedy for his unauthorized seizure within its territory. Even this treaty with that country provides for the extradition of persons charged with kidnapping, and on demand from Peru, Julian [the party who abducted Ker], could be surrendered and tried in its courts for this violation of its laws. The party himself would probably not be without redress, for he could sue Julian in an action of trespass and false imprisonment, and the facts set out in the plea would without doubt sustain the action. Whether he could recover a sum sufficient to justify the action would probably depend upon moral aspects of the case which we cannot here consider.

119 U.S. at 444.

As the above quotation indicates, the question of civil liability is certainly an open one, as is the criminal liability of the apprehending agents and others under asylum state law. We discuss criminal liability in Part IV below.

There appear to be three potential civil liability theories: constitutional violations by American agents, common law torts committed by American agents (*i.e.,* false imprisonment), and violation of international law. The potential defendants are the federal government and individual government officials involved in this operation.[20]

By virtue of the Federal Tort Claims Act (FTCA), the United States has waived sovereign immunity with respect to the torts of assault, false imprisonment, and false arrest. 28 U.S.C. §§ 2674, 2680(h). The authorities are split on whether that waiver includes related constitutional torts.[21] There is, however, unanimous, albeit limited, authority that even for common law torts, the FTCA is not a total waiver of sovereign immunity. In the leading case, the Fourth Circuit has held that

---

[19] By "acquiescence" we do not mean formal endorsement. It is sufficient that the asylum state agree not to protest the apprehension.

[20] Those who authorize, direct, participate in, or ratify the operation are potentially liable.

[21] *Compare Norton* v. *United States,* 581 F.2d 390 (4th Cir.), *cert. denied,* 439 U.S. 1003 (1978), *with Birnbaum* v. *United States,* 588 F.2d 319 (2d Cir. 1978). *Birnbaum,* however, did not have to consider the effects of the 1973 amendments to the FTCA. We think that the best assumption in light of those amendments is that the FTCA does waive sovereign immunity for damage actions predicated on Fourth Amendment violations. Boger, Gitenstein & Verkuil, *The Federal Tort Claims Act Intentional Torts Amendment: An Interpretative Analysis,* 54 N.C. L. Rev. 497 (1976).

immunity that is available to government officers sued in their personal capacities can also be asserted by the government when it is sued in their stead under the FTCA.[22] Therefore, the key to analyzing the potential for civil liability is to determine whether government officials involved in this operation would enjoy either an absolute or qualified immunity if sued individually for damages.

The Supreme Court has held that federal officials have a qualified immunity from damage actions in cases of constitutional torts, and that immunity at least that great governs common law torts.[23] Qualified immunity will be available for the proposed operation if it is within the outer limits of the FBI's authority and is conducted in good faith with a " 'reasonable belief in the validity of the arrest and search and in the necessity for carrying out the arrest and search in the way the arrest was made and the search was conducted.' " [24] For reasons stated below, we think those conditions are satisfied only if the operation is conducted with the acquiescence of the asylum state.

Law enforcement officers are acting beyond the "outer limits" of their authority when they act beyond their jurisdiction.[25] As the instant operation is presently conceived, the FBI and its agents are likely to be found not acting within these jurisdictional bounds because U.S. agents have no law enforcement authority in another nation unless it is the product of that nation's consent. We have on prior occasions counseled that the FBI has lawful authority under United States law to conduct investigations in a foreign country provided those investigations relate to a matter within the statutory jurisdiction of the FBI. While no statute explicitly authorizes the FBI to conduct investigations outside of the United States, 28 U.S.C. § 533(1) contains no geographical restrictions and its general authorization—to detect and prosecute crimes against the United States—would appear to be broad enough to sanction activity toward this end no matter where it was undertaken. But we have coupled that opinion with the recommendation that any operations strictly adhere to local law and function with the knowledge and at least tacit approval of the country involved. We think any argument that § 533 gives the FBI authority to make forcible arrests anywhere in the world is at best tenuous; the sounder interpretation is that its authority is limited, like that of the United States generally, by the sovereignty of foreign nations. As we indicated in Part II, the asylum

[22] Norton, 581 F.2d at 394–97; see Daniels v. United States, 470 F. Supp. 64 (E.D.N.C. 1979).
[23] Butz v. Economou, 438 U.S. 478, 506–08 (1978) (holding that only a qualified immunity is available for most constitutional torts); Barr v. Matteo, 360 U.S. 564 (1959) (absolute immunity available for some common law torts); see Expeditions Unlimited, Aquatic Enterprises, Inc. v. Smithsonian Institution, 566 F.2d 289 (D.C. Cir. 1977), cert. denied, 438 U.S. 915 (1978); Granger v. Marek, 583 F.2d 781, 784 (6th Cir. 1978).
[24] Norton v. United States, 581 F.2d at 393 (quoting Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 456 F.2d 1339, 1348 (2d Cir. 1972)).
[25] E.g., Bates v. Clark, 95 U.S. 204, 208–10 (1877) (no official immunity for seizure not made in Indian country because relevant statute only authorized seizure in Indian country). Bates and similar cases are discussed approvingly in Butz v. Economou, 438 U.S. at 489–95.

state's sovereignty would be "violated" for purposes of subsequent litigation if it filed a formal protest.

Our conclusion regarding the scope of § 533 is dictated by two distinct but related lines of analysis. A conventional statutory construction rule regarding the scope of an official's authority states that where a statute imposes a duty, it authorizes by implication all reasonable and necessary means to effectuate such duty. Given the target's fugitive status and the inadequacy of extradition, [26] it can be forcefully argued that this operation is necessary if the FBI is to carry out its law enforcement mission under § 533. However, the *reasonableness* of the operation is questionable if it violates international law or United States law. All methods of rendition outside the traditional extradition mechanism have received substantial criticism from international law specialists and in academic journals. The tenor of these remarks is that such extraordinary means of apprehension undermine international order and breed disrespect for the traditional means of fostering cooperation and arbitrating disputes among nations. [27] Judges in abduction cases have expressed concern that such extraordinary apprehensions denigrate the rule of law in the name of upholding it. [28] We think that concern, when coupled with a U.S. or international law violation, may well lead courts to conclude that the activity lies beyond the jurisdiction of the FBI. [29]

The opinion of Chief Justice Marshall in *The Schooner Exchange* v. *McFaddon,* 11 U.S. (7 Cranch) 116, 136 (1812) suggests a second approach to defining the limits of the FBI's jurisdiction under § 533. The FBI's power cannot extend beyond those of the United States. The *de jure* authority of the United States is necessarily limited by the sovereignty of other nations:

---

[26] We are assuming that it can be established that extradition is an inadequate means of apprehension in this case. We emphasize here the importance of an ability to make such a showing.

[27] *E.g.,* M. Bassiouni, *International Extradition and World Public Order* 121-201 (1974); and sources cited *supra,* note 16.

[28] Although he concurred in the result in *Lira,* 515 F.2d at 73, this concern prompted Judge Oakes to observe: "To my mind the Government in the laudable interest of stopping the international drug traffic is by these repeated abductions inviting exercise of [the court's] supervisory power in the interest of the greater good of preserving respect for law." *See also, Toscanino,* 500 F.2d at 276.

[29] It should be noted that this is to argue that the FBI has the authority to violate the local law of another country as long as that country does not object. We think three doctrines, although none is addressed directly to the question under consideration, conjoin to support this conclusion.

First, the "act of state" doctrine evinces "judicial deference to the exclusive power of the Executive over conduct of relations with other sovereign powers" and "precludes any review whatever of the acts of the government of one sovereign State done within its own territory by the courts of another sovereign State." *First National City Bank* v. *Banco Nacional de Cuba,* 406 U.S. 759, 763, 765 (1972) (opinion of Rehnquist, J.). We think that to say the FBI had no authority to apprehend the fugitive, despite the acquiescence of the asylum state, because such apprehension was in violation of local law is in fact to judge the actions of the asylum state—here its failure to enforce arguably applicable local law. Second, it is tantamount to giving an individual the right to dispute a nation's conception of its own sovereign interests in violation of the principle that only the sovereign has standing to assert and construe its interest. Third, there is the maxim that the penal laws of a foreign country are not enforced in the courts of this country, but must be enforced in the place where the violation occurs. *Banco Nacional de Cuba* v. *Sabbatino,* 376 U.S. 398, 413-14 (1964).

> The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction.
>
> All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source.

11 U.S. (7 Cranch) at 136.

In short, both lines of analysis suggest that in the absence of asylum state consent, the FBI is acting outside the bounds of its statutory authority when it makes an apprehension of the type proposed here— either because § 533 could not contemplate a violation of international law or because the powers of the FBI are delimited by those of the enabling sovereign. Once the "authority" hurdle is surmounted, however, we think that the other parts of the good faith defense are readily met. There is ample probable cause and a number of outstanding bench warrants.

Assuming the operation goes forward without asylum state consent, it is necessary to examine more closely the civil liability theories that may be put forward by the fugitive. There are two constitutional arguments available to him. The first is that he is subject to an unreasonable search and seizure in violation of the Fourth Amendment. The second is the Fifth Amendment due process argument based on the logic of *Toscanino*. The Bill of Rights does apply to actions of American officials directed at American nationals overseas,[30] and it is our view that the proposed operation would have some Fourth Amendment problems due to the absence of asylum state consent.

The standard Fourth Amendment requirement for an arrest is that it be based on probable cause. *Beck* v. *Ohio,* 379 U.S. 89, 91 (1964); *Gerstein* v. *Pugh,* 420 U.S. at 111–12. "[W]hile the Court has expressed a preference for the use of arrest warrants when feasible . . . , it has never invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant." *Id.* at 113. Here we have warrants and probable cause. The Fourth Amendment problem stems instead from the FBI's lack of statutory authority for an extraterritorial apprehension that has not been sanctioned by the asylum state.

Where federal officials act without explicit statutory authority, the validity of an arrest in this country turns on whether it meets the

---

[30] *Reid* v. *Covert,* 354 U.S. 1, 5–6 (1957); *Berlin Democratic Club* v. *Rumsfeld,* 410 F. Supp. 144, 160–61 (1976).

standards for a valid citizen's arrest under state law.[31] If a court extrapolated that reasoning to the international context, the pertinent question would be the standards for a citizen's arrest in the asylum state.[32] The rule in the asylum state is that "[a]ny person may, with or without warrant or other legal process, arrest and detain another person who has committed a felony." Presumably this is a reference to domestic felonies; otherwise the statute would authorize arrests for crimes that are not punishable in domestic courts and are not the subject of an extradition order. Thus we think this asylum state statute could not afford to U.S. officials authority to arrest for U.S. felonies within the asylum state's territory. So in the absence of asylum state consent and the § 533 authority to arrest that comes with it, the fugitive has a plausible Fourth Amendment claim. In contrast, for reasons stated in Part I of this memorandum to support the conclusion that, in the absence of the brutality alleged in *Toscanino,* there is no due process violation warranting divestment of jurisdiction, we conclude that there would be no Fifth Amendment violation warranting a civil remedy.

We do not view a violation of international law as a legally sufficient *independent* basis for a civil action. The reason is the distinct compass of international law. Last February the Fifth Circuit observed in the analogous context of a vessel seizure:

> Since 1815 it has been established that redress for improper seizure in foreign waters is not due to the owner or crew of the vessel involved, but to the foreign government whose territoriality has been infringed by the action.[33]

The fugitive lacks standing to pursue the violation of international law.[34]

The final potential bases for civil liability on the part of the federal government and individual federal officials are the common law torts of false imprisonment, false arrest, assault and battery. And to the question of liability must be added the question of forum.

---

[31] *See United States* v. *Di Re,* 332 U.S. 581, 589–92 (1948); *Alexander* v. *United States,* 390 F.2d 101 (5th Cir. 1968); *United States* v. *Viale,* 312 F.2d 595, 601 (2d Cir.), *cert. denied,* 373 U.S. 903 (1963).

[32] Of course, a court could also conclude that federal agents do not have any citizen's arrest privileges in the asylum state and therefore cannot avail themselves of citizen arrest standards to argue the validity of the seizure.

[33] *United States* v. *Conroy,* 589 F.2d 1258, 1268 (5th Cir. 1979); *see also The Richmond,* 13 U.S. (9 Cranch) 102, 103 (1815).

[34] Nor does the international law argument add to the fugitive's potential Fourth Amendment claims, except to the extent that it delimits the statutory authority of the FBI. As the Fifth Circuit has noted:

> Whether the search and seizure were Fourth-Amendment-unreasonable must be established by showing that interests to be served by the Fourth Amendment were violated, and not merely by establishing the violation of general principles of international law.

*Cadena,* 585 F.2d at 1264.

We note that by its terms the Federal Kidnapping Act is inapplicable in the context of the proposed operation. It pertains to abductions "within the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 1201(a)(2). *But see Toscanino,* 500 F.2d at 276.

Although a civil suit in the asylum state against U.S. officials is theoretically possible, it is an unlikely course for the fugitive to take because of the obvious logistical problems, the fact the United States would not be amenable to suit there, and difficulties the asylum state courts would have in obtaining personal jurisdiction over individual government officers. It is much more likely that any action for common law torts would be instituted in the United States, and we think such an action could be maintained in this country.

According to private international law, injuries to a person or personal property of another are transitory and the right to redress follows the defendant to foreign lands.[35] This principle has been recognized in the United States.[36] All that is necessary is that the defendant be found within a jurisdiction in this country. The law to be applied is normally that of the site of the tortious conduct—the asylum state in this case [37]—although we think American law would still govern the question of immunity.[38] It is always possible that the fugitive would be nonsuited because a court regards the cause of action as repugnant to the policies of the forum state. But the *dicta* in *Ker* about damage actions make that result less certain,[39] and we think that in the absence of an immunity defense the United States and individual federal officials could be held liable for false imprisonment.

The law of the place of the tort also usually governs the damage award.[40] Exemplary damages are available under English common law, and consequently asylum state law, as are damages for nervous shock.[41] By their very nature, the size of such awards is impossible to predict; we can only advise that exemplary damages would not be available in an action against the United States.[42] Although there is no precedent on point, we think that it is unlikely that an American court would be receptive to an argument that a fugitive should be compen-

---

[35] *See, e.g.,* G. Cheshire, Private International Law 240–42 (1965).

[36] *See, e.g., Slater* v. *Mexican National R.R. Co.,* 194 U.S. 120 (1904); *Schertenleib* v. *Traum,* 589 F.2d 1156, 1165 (2d Cir. 1978); *Mobil Tankers Co.* v. *Mene Grande Oil Co.,* 363 F.2d 611, 615 (3d Cir.), *cert. denied,* 385 U.S. 945 (1966).

[37] *See generally,* G. Cheshire, Private International Law 240–57 (1965); M. Hancock, Torts in the Conflict of Laws 54–63 (1942); Restatement (Second) of the Conflict of Laws §§ 10, 145 (1969). Of course, this is not an ironclad rule and the government would be free to argue that a suit between a U.S. citizen and his government created a sufficient nexus with the American forum to dictate the application of its tort liability principles. But those principles are unlikely to vary sufficiently to make a difference in the outcome.

[38] Although state law may govern the cause of action, federal courts have applied a uniform federal rule in determining whether the defendant enjoys official immunity. *Barr* v. *Matteo,* 360 U.S. 564, 569–76 (1959). There is no justification for departing from that rule because the cause of action arises under foreign law.

[39] Appellate courts have had divergent views on what forum the Supreme Court had in mind when it alluded to damage actions in *Ker,* 119 U.S. at 444. *Compare Waits* v. *McGowan,* 516 F.2d at 207 n.7 (damage actions in state courts) *with United States ex rel. Lujan* v. *Gengler,* 510 F.2d at 64–65 n.3 (damage actions in foreign courts).

[40] *See* G. Cheshire, Private International Law 602–04 (1965); M. Hancock, Torts in the Conflict of Laws 113–120 (1942); Restatement (Second) of Conflict of Laws §§ 10, 145, 171 (1969).

[41] H. Street, The Law of Torts 114–17, 440 (1976).

[42] 28 U.S.C. § 2674; *see, e.g., Johnson* v. *United States,* 547 F.2d 688, 690 n.5 (D.C. Cir. 1976).

sated for his lost opportunity to evade the lawful processes of the United States. Such an argument suggests a personal "right of asylum," a right explicitly rejected in *Ker,* and the argument could be properly rebuffed as against the public policy of the forum. Also injunctive relief, ordering that the fugitive be returned to the asylum state, is squarely inconsistent with *Ker.* We note that there is no provision for indemnification of government officials held liable in an action for false imprisonment.[43]

## IV. Criminal Liability and the Importance of Asylum State Consent

The importance of asylum state consent is perhaps most dramatically highlighted by the possibility that federal officials may be extraditable to the asylum state for kidnapping.[44] A number of abduction cases, including *Ker,* have discussed this possibility.[45] The only effective safeguard against the diplomatic embarrassment and personal anxiety an extradition request would create is a prior agreement with the asylum state that no extradition request will be made.

In sum, asylum state consent appears pivotal to the success of the operation, both as a matter of litigation and public perception. A formal diplomatic protest would force the Second Circuit to decide whether to divest the district court of its criminal jurisdiction as a result of the international law violation. It would make an immunity claim in any civil action difficult to maintain as well as provide the fugitive with a strong argument that the operation violated his Fourth Amendment rights. It would present the possibility of an embarrassing extradition request. Finally, in the current international climate, this country can ill afford an operation that would permit others to argue that the United States does not respect international law. We advise that you not authorize the operation without the asylum state's tacit consent.

## V. Miscellaneous Considerations

If an apprehension is to be made, we recommend that it be made in the same manner as any professional arrest: with expedition, minimum

---

[43] Torts Branch Monograph, Damage Suits Against Federal Officials, Department of Justice Representation, Immunity 10–11 (Nov. 1978).

[44] Art. 3, para. 7 of the extradition treaty between the United States and the asylum state lists kidnapping and false imprisonment as extradition offenses. The penal code of the asylum state provides:

> A person is guilty of kidnapping—
>
> (1) who unlawfully imprisons any person, and takes him out of the jurisdiction of the court, without his consent; or
>
> (2) who unlawfully imprisons any person within the jurisdiction of the court, in such a manner as to prevent him from applying to a court for his release or from discovering to any other person the place where he is imprisoned, or in such a manner as to prevent any person entitled to have access to him from discovering the place where he is imprisoned.

[45] *E.g., Lujan,* 510 F.2d at 64–65 n.3; *Villareal* v. *Hammond,* 74 F.2d 503, 505–06 (5th Cir. 1934); *Collier* v. *Vaccaro,* 51 F.2d 17, 20–21 (4th Cir. 1931).

restraint, and with full sensitivity to the fugitive's physical needs and constitutional rights. We would recommend that the fugitive be informed of his rights and the presence of outstanding warrants immediately upon his apprehension in the the asylum state and again immediately within the territorial confines of the United States. Even if the fugitive waives his rights, we recommend that there be no attempt at interrogation until the fugitive is within the territorial limits of the United States.

As far as the participation of asylum state nationals is concerned, we make the following observations: Insofar as foreign nationals are acting at the behest or direction of this government, they will be regarded as American agents by the courts. If they take action outside the ambit of that agency relationship, *e.g.*, resort to torture, this government may successfully maintain that it was not a party to that action.[46] But this does not militate in favor of using asylum state nationals because FBI agents are not likely to engage in improper conduct in the first place. We think that the use of foreign nationals raises more questions of strategy than of law. Only if foreign nationals, without U.S. direction or compensation, deposited the fugitive on American soil would the legal problems in this memorandum be obviated by their presence.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[46] *E.g., Lira,* 515 F.2d at 70–71.