UNITED STATES of America, Plaintiff,

v.

Stephen Nathaniel WILLIAMS,
Defendant.

Crim. No. 75–371.

United States District Court,
D. New Jersey.

Nov. 30, 1981.

Stephen Nathaniel Williams, pro se.

OPINION

BIUNNO, District Judge.

Williams was found guilty of armed bank robbery, 18 U.S.C. § 2113(a) and (d), by verdict of a jury rendered November 3, 1975, after trial. A study was conducted under 18 U.S.C. § 4205(c) and (d) (1976) and a final sentence of 25 years was imposed August 23, 1976. A history of the case is set out in the court's ruling of March 23,

1978 in connection with a Rule 35 motion, Appendix A to this opinion, and need not be repeated here.

Williams is now in federal custody serving his sentence. He has now filed a motion under 28 U.S.C. § 2255. He attacks the indictment itself and seeks its dismissal for lack of jurisdiction. A statement of facts and brief were filed November 23, 1981.

Under the statute, as well as Rule 4 for § 2255 motions, the matter is referred to the sentencing judge for initial consideration. He is to examine all the files, records, transcripts and correspondence relating to the judgment under attack and is to order summary dismissal if (under the Rule) it "plainly appears" that the movant is not entitled to relief or (under § 2255) if the papers reviewed "conclusively show" that the prisoner is entitled to no relief. While Rule 4 was enacted by Congress after the statute, the court will apply the stricter statutory standard.

The claim of lack of jurisdiction is grounded on the assertion that Williams is a member of the New Afrikan Nation, and a citizen of the Republic of New Africa. He claims to be a combatant against federal and state authorities, fighting against colonialism and thus entitled to the protection of the Geneva Convention as a prisoner of war and not subject to the jurisdiction of a civilian court.

He argues that the jurisdiction over him here is derived politically, economically and historically from illegal American occupation and control of the New Republic of Afrika through the slave trade and the institution of slavery. The implication from his argument is that his presence in the United States is the consequence of kidnapping by slave traders, or the result of the use of fraud or force, and thus he cannot be said to be lawfully within the jurisdiction of this court, citing *U. S. v. Toscanino*, 500 F.2d 267 (CA 2, 1974), which he claims ought to be extended to his theory.

The New Republic of Afrika, by whatever name, is not a sovereign nation recognized as such by the United States. At most, it is a black separatist organization or movement. While persons in the United States are free to form or join a wide variety of organizations, including political organizations whose aim is separation, such groups are no more than organizations unless recognized as nations or otherwise achieve their aims. This has not occurred.

There is no doubt that the importation of persons as slaves was sanctioned, insofar as the states were concerned, by Art. 1, sec. 9, cl. 1 of the U. S. Constitution. That provision prevented the Congress from exercising its commerce power in that regard until the year 1808, twenty years after the adoption of the Constitution. See, *Groves v. Slaughter*, 40 U.S. (15 Pet.) 449, at 513–515, 10 L.Ed. 800 (1841); *Scott v. Sandford*, 60 U.S. (19 How.) 393, at 411, 15 L.Ed. 691 (1857); *Smith v. Turner*, (Passenger cases) 48 U. S. (7 How.) 283, at 453, 12 L.Ed. 702 (1849).

Halting of the importation of slaves, however, did not alter the status of those already so imported or of their progeny. It was the 13th Amendment that abolished slavery as such, whether the person had been imported as a slave or was the offspring born here of imported slaves. And, by the 14th Amendment, all persons born in the United States were made citizens thereof and of the State wherein they reside. *United States v. Wong Kim Ark*, 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890 (1898); *Slaughter House Cases*, 83 U.S. (16 Wall.) 36, at 72–73, 21 L.Ed. 394 (1873).

It is shown by the presentence report that Williams was born on July 23, 1946 in Jersey City, N. J., and raised in Newark and East Orange, N. J. Putting to one side the 5 instances of juvenile delinquency shown, his conduct thereafter showed arrests and convictions as follows:

| | | |
|---|---|---|
| 10/13/64 | East Orange | Larceny |
| 6/30/65 | East Orange | Disorderly Conduct |
| 6/30/65 | East Orange | Entry and Larceny |
| 6/21/67 | Newark | Attempted robbery |
| 12/11/67 | Newark | Possession of stolen car |
| 8/19/68 | East Orange | Bank robbery |

After release from imprisonment and while on parole for the last offense mentioned, Williams was arrested for the August 1, 1975 armed bank robbery for which he is now confined.

This record establishes that Williams was born in and has been domiciled in New Jersey his entire lifetime and so he has at all times been a citizen of the United States and of New Jersey. The files and records of the court conclusively show that he is entitled to no relief on the ground advanced, and the motion will be summarily dismissed.

## APPENDIX A

### MEMORANDUM

#### March 23, 1978

#### Re: U. S. v. Williams, Cr 75–371

This is an armed bank robbery case. Defendant was convicted by a jury after trial and sentenced to the maximum permitted by law for the purpose of a study to aid the court in deciding what sentence finally to impose. The study was made, received and reviewed, and final sentence of 25 years was imposed August 23, 1976.

On appeal, the conviction was affirmed. Petition for certiorari was denied. · On May 24, 1977, within time, a motion to correct and reduce sentence was filed. A long delay ensued despite 3 orders setting briefing schedules, none of which was met (order dated June 20, 1977; memorandum order dated January 9, 1978; order dated January 28, 1978), and papers continued to be submitted for defendant thereafter (letters of February 17 and 22, 1978).

Being in doubt of its jurisdiction to act at all, the court entered a Memorandum Order dated March 6, 1978 reviewing the case and motion history and setting a schedule for briefs on the point.

*Motion to Reduce Sentence*

On the merits of this motion and putting aside the matter of jurisdiction to reduce in the circumstances of this case, the court finds that no showing has been made sufficient to persuade it to modify or reduce the sentence. The motion is accordingly denied. The reasons follow.

At the sentence of January 16, 1976, the court had the benefit of a full presentence report; it had the benefit of hearing the testimony at trial; it had the benefit of the · earlier presentence report on a previous bank robbery conviction; it had the benefit of materials presented in connection with an application to modify bail during trial, including a conference with defendant's parents; it had the benefit of institutional behavior and conduct reports during the service of the earlier bank robbery sentence. It had the benefit of the presentations made at the sentencing hearing itself.

All of these materials indicated that defendant, although provided with the encouragement, support and love of hardworking, industrious and high-principled parents, had not only "gone astray" but had gone wide astray. The history showed a mixture of pampering or "spoiling", by the parents, coupled with resentment, revolt and violence by defendant.

His misbehavior escalated over the years, reaching a peak with the first bank robbery. He was tried, convicted and sentenced. He served part of his term and was released on parole. The institutional record was not a good one, and it was the court's impression that he was released too early, after too brief a period of good behavior following a longer and rather poor record.

It was while still on parole that the second bank robbery was committed. The evidence of defendant's participation, even if only as an "aider and abettor," was overwhelming. His wife's car was used as the "switch" from the getaway car, was traced and located nearly in close pursuit, and defendant was arrested in a matter of hours after the robbery. When arrested, he had two of the "bait bills" in his possession.

This was highly persuasive and damning evidence in itself. It was even more damning when his wife testified that she had given him one of the bills earlier in the week, and when a friend testified he had given him the other one in repayment of a

loan, the very morning of the robbery. Even if a packet of bait bills, by mistake, had been put in circulation by a bank teller on some earlier date, the chances that two of them would have found their way into defendant's hands at the same time are infinitesimally small. The friend later pleaded guilty to perjury and admitted that the alleged payment never occurred.

Every factor was so utterly negative that the court felt it ought to have the benefit of a study, as authorized by law, and ordered it. On its receipt and review, the court found nothing to modify or alter its earlier impressions, and the final sentence imposed was for the maximum of 25 years.

The Congress had made it clear that: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense . . . for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3577.

Also, by Fed.Ev. Rule 1101(d)(3), [Pub.L. 93–595], Congress has explicitly declared that, except for privileges, the federal evidence rules "do not apply [to] sentencing. . . ."

Since his conviction in 1975, defendant receives the benefit of the revisions made by Pub.L. 94–233 (March 15, 1976), in that his release on parole is mandatory after serving two-thirds of his term, i.e., at 16 and ⅔ years even if he has not earned good time and industrial credits, 18 U.S.C. § 4208(d) [1976]. Such release may only be denied if there be a finding that the prisoner has "seriously or frequently" violated institutional rules and regulations, or if it be found that there is a reasonable probability that he will commit "any federal, State or local crime", *idem.*

Beyond that, he can earn deductions for good conduct of 10 days each month (the sentence being for more than 10 years) under 18 U.S.C. § 4161, and additional deductions for actual employment in an industry at the rate of up to 3 days each month during the first year, and up to 5 days each month in later years, 18 U.S.C. § 4162. If he earns and does not forfeit such deductions, 18 U.S.C. § 4165, he "shall be released" at the expiration of his term of sentence less the time deducted for good conduct, 18 U.S.C. § 4163. This can work out, under the formula, to less than two-thirds of the sentence, and if so released, the release is "deemed as if on parole" until the end of the sentence, less 180 days, 18 U.S.C. § 4164. His earliest eligibility for parole is after serving one-third of the sentence or 8 years, 4 months, 18 U.S.C. § 4205 [1976]. In between that time and such maximum as may apply, his release is a matter to be decided by the Parole Commission. The court is aware of the "guidelines".

Defendant's conduct, by participating in an armed bank robbery after some years in jail under the sentence for the earlier bank robbery obviously means that he must be placed where he cannot rob any banks for as long as the law allows. His experience serving time for one bank robbery evidently did not teach him not to rob banks. He must be prevented from robbing banks for as long as possible even though he may never learn not to rob banks.

It was said, long ago:

"Hang a thief when he's young, and he'll no steal when he's auld", Andrew Henderson, "Scottish Proverbs" (The Home Book of Quotations, *Stevenson*, Dodd, Mead & Co., New York, 1947)

Thieves are not hanged any more, of course, so they can steal a second time. When they do, the span of time before they can steal a third time should be as long as possible. This is not a matter of vengeance, harshness, or lack of sympathy or mercy. It is simply a matter of isolating the infectious agent to prevent its spread. It is prophylaxis for society.

Defendant had the opportunity to operate, manage and eventually own the successful enterprise his parents built over the years. He had this opportunity after release from jail on the first bank robbery. He knew what it was to serve extended time, and what it is like to be confined. Yet, when given his freedom he was too

impatient to work and to earn the opportunity offered him, and which few have. He still wanted to "get rich quick", and the only way he knows, evidently, is to rob a bank.

### The Study Report

Defendant complains of the adequacy of the study report. He wants to be examined by experts of his own selection. Two Ph.D's in Psychology, Leonard S. Abramson and Raymond P. Lorion, have written unsworn statements criticising the report. What they were given, aside from a copy of the study report, does not appear in their statements. Leonard S. Abramson evidently was given some comments conveying the attorney's views, for he opens his second paragraph with the phrase: "I fully accord with your impression that . . ."

Nothing in either critique discloses that either one of these psychologists was provided with all the factual material (highlights of which are summarized above) that the court had available for its consideration at final sentence. Expert opinions depend, for their persuasive value, on the underlying facts or data in the particular case, together with the rationale leading to the opinion. See, Fed.Ev. Rule 703. The critiques submitted are of no value to the court, and their careful review in no way alters its view in regard to the proper sentence in this case.

The court has used the "sentence for study" method provided by law in many cases. Despite the critiques, it has also always found them exceptionally useful. In a number of cases, all much less serious than this one and usually where there is no prior record, the court has succumbed to the importunings of counsel to allow the study to be made privately by experts of defendant's selection. These have been uniformly useless and unreliable as shown by later misconduct of the defendant involved.

The reason may be that official studies are conducted with the needs of the sentencing judge in mind. They are designed to supplement whatever the court already has in the presentence report so that it can arrive at a decision on the proper sentence

to impose. Private, external studies, on the other hand, seem to ignore this key focus of any study and have a tendency to place the blame for misconduct on the imperfections inherent in any social structure. The court is fully aware of those imperfections, but such awareness does not aid it in the decision every sentencing judge must make: what is the proper sentence to impose on *this* defendant for *this* offense, taking *all* pertinent factors into account, and striking a balance between punishment, deterrence of the defendant, deterrence of others, and the protection of society.

The critiques submitted fall far short of raising any colorable challenge to the official study report, much less to the *sentence* (the only valid issue on a Rule 35 motion).

Accordingly, no useful purpose would be served either by (a) further private studies, or (b) a plenary hearing to take the testimony of those who prepared the report. The only statutory authorization is for the official study. There is no "right" to any other study. Defendant's conduct, the record of which is fully established, speaks with the loudest voice of all. No further private study can alter the facts of that conduct.

### Jurisdiction

In its Memorandum Order of March 6, 1978, the court raised questions in regard to its jurisdiction under the cases mentioned and under the circumstances here, to consider the Rule 35 motion at all.

Having considered the merits, and having decided them adversely to defendant, it is unnecessary to rule on the point, even though this is not a case like *United States v. Mendoza*, 565 F.2d 1285 (CA–5, 1978), where the motion and all papers were in the trial court's hands long before the 120 day limit had run, and lack of time on the part of the court to act within that period was the only obstacle to a reduction of sentence which the court was inclined to make.

Here, only the bare motion and a plea for enough time to resurrect the file were in the court's hands during the 120 days. On that presentation there would have been no basis for reducing the sentence. Although

additional time was allowed, the later submissions were beyond even those generous limits and might well have been disregarded entirely. Instead, they have been considered on the merits.

With one exception, there is no appeal from the magnitude of a sentence in the federal system. Contrast the different arrangement in New Jersey, N.J. Court Rule R.1:10–3. The only exception in the federal system is in the case of an increased sentence for dangerous special offenders imposed under 18 U.S.C. § 3575. In such cases, the Court of Appeals may not only review the sentence itself, as such, even though not exceeding the maximum authorized by law, but it may act as a court of original jurisdiction and itself impose a different sentence, either a greater one on an appeal by the United States, or a lesser one on appeal by the defendant, 18 U.S.C. § 3576. In the federal system there is no parallel to the authority of *N.J.Const.*, 1947, Art. 6, § 5, par. 3, which enables the state's Supreme Court, and its Appellate Division of the Superior Court, to "exercise such original jurisdiction as may be necessary to the complete determination of any cause on review". That authority is exemplary, commendable and effective, but it simply does not exist in the federal judicial system with the exception noted. Congress had not seen fit to take that step.

In his letter memorandum dated March 20, 1978 and received March 21, 1978, defendant's attorney argues that the time for a Rule 35 motion has not yet run. This argument is bottomed on the proposition that the 120 day period runs from the time that the Supreme Court's denial of certiorari was docketed by the Clerk of the Court of Appeals.

This contention requires a chronology of events:

11/3/75 Verdict of guilty returned by jury

1/16/76 Sentenced to maximum term and for a study; 18 U.S.C. § 4208(c) [revised 1976, as 18 U.S.C. § 4205(d)]

1/23/76 Notice of appeal to Court of Appeals filed

8/23/76 Final sentence after study imposed

4/4/77 Judgment in lieu of mandate on affirmance docketed by Clerk of District Court

?/?/77 Petition for certiorari filed with Supreme Court

5/24/77 Rule 35 motion filed in District Court

5/31/77 Petition for certiorari denied

?/?/77 Denial of certiorari docketed by Clerk of Court of Appeals

As noted in the ruling of March 6, 1978, Rule 35 sets a 120 day time limit measured by any of three starting points:

1. the date sentence is imposed (here, 8/23/76);

2. the date of *receipt* of a mandate on affirmance (here, 4/4/77);

3. the date of *entry* of any order of the Supreme Court denying review [on certiorari] (here, May 31, 1977)

The Rule 35 motion was not filed within 120 days after final sentence. It was filed within 120 days after receipt here of the judgment in lieu of mandate on affirmance. It was filed *before* the *entry*, on May 31, 1977, of the Supreme Court's order denying certiorari.

Thus, if the motion is to be considered as timely, it can only be under the second starting point. This is because the running of the 120 day period after denial of certiorari begins with the date of *entry* of the order of denial by the Supreme Court. No Rule 35 motion was filed after May 31, 1977.

Thus, if the argument of defendant's counsel were accepted, there would be no jurisdiction to consider a Rule 35 motion measured from the date of entry of the Supreme Court order denying certiorari. The time for that has long since run. Thus, the motion can only be considered timely if measured from the date of docketing of the judgment in lieu of mandate of the Court of Appeals.

*Conclusion*

In view of the decision arrived at on the merits, it is not necessary for the court to decide whether it has jurisdiction to reduce sentence under Rule 35 this long after final imposition of sentence, under the circumstances present here. See, *U. S. v. Janiec,* 505 F.2d 983 (CA–3, 1974), *cert. den.* 420 U.S. 948, 95 S.Ct. 1331, 43 L.Ed.2d 427 (1975); *Dodge v. Bennett,* 335 F.2d 657 (CA–2, 1964); *Irizzary v. U. S.,* 58 F.R.D. 65 (D.Mass., 1973); *U. S. v. Ursini,* 296 F.Supp. 1152 (D.Conn., 1968); *U. S. v. Hughes,* 36 F.R.D. 25 (S.D.N.Y.1964); *U. S. v. Stollings,* 516 F.2d 1287 (CA–4, 1975); *U. S. v. Mendoza,* 565 F.2d 1285 (CA–5, 1978).