Michael SNEED, Appellant,

v.

STATE of Tennessee, Appellee.

Court of Criminal Appeals of Tennessee, at Knoxville.

Feb. 22, 1993.

Kevin W. Shepherd, Asst. Dist. Public Defender, Maryville, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, Jerry L. Smith, Deputy Atty. Gen., Nashville, and Michael L. Flynn, Dist. Atty. Gen., Maryville, for the State.

*OPINION*

WADE, Judge.

The appellant, Michael Sneed, appeals the trial court's dismissal of his petition for habeas corpus relief. The issue is whether the trial court properly dismissed the petition without an evidentiary hearing. We hold that the summary dismissal was erroneous. The judgment is, therefore, reversed and the cause is remanded for a hearing.

The petitioner claims that upon his release from custody in Kentucky on February 6, 1992, he was unlawfully and illegally transported to this state for placement in the Blount County Jail. In his petition, he asserted that a waiver of extradition he had signed as a part of his certificate of parole on October 26, 1990, was coerced and, in any event, was not a proper basis for his transfer; he claims that Blount County officials altogether failed to comply with the Uniform Criminal Extradition Act. Tenn.Code Ann. §§ 40–9–101 to –130. The petitioner's Kentucky counsel executed an affidavit alleging that the transfer of custody was made despite the strenuous objections of the petitioner. The affidavit provides that the Knox District Court in Kentucky found that the petitioner had been removed from the jurisdiction without lawful authority and that kidnapping warrants had been issued against those Tennessee officials who had taken the petitioner into their custody.

Some background information may be appropriate. In *Elliott v. Johnson*, 816 S.W.2d 332 (Tenn.Crim.App.1991), our court held as follows:

> [O]nce the petitioner is brought within the boundaries of this state, *absent outrageous or illegal conduct by the arresting authorities so extreme as to shock the conscience,* he may be placed upon trial for any charges pending.

*Id.* at 339 (emphasis added).

Our court reconciled its holding with the decision in *Swaw v. State*, 3 Tenn.Crim.App. 92, 457 S.W.2d 875 (1970). In *Swaw*, this court held that a post-conviction petitioner who had pled guilty to an offense in this state could not later challenge his conviction based upon deficiencies in the extradition process.

The opinion quoted with approval *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952):

> [D]ue process of law is satisfied when one present in court is convicted of a crime after having been apprised of the charges against him and after a full trial in accord with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person lawfully convicted to escape justice because he was brought to trial against his will.

457 S.W.2d at 876. *See Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886).

Our opinion in *Elliott* acknowledged the existence of the *Ker–Frisbie* doctrine, based upon the 1886 and 1952 U.S. Supreme Court cases that, as indicated, generally held to the notion that extradition was never an issue no matter how the accused was brought into this country. These federal decisions have traditionally served as precedent for state courts in matters of interstate extradition. Yet, as *Elliott* noted, both cases pre-dated the adoption of the Uniform Criminal Extradition Act. This court denied habeas corpus relief in *Elliott*. We recognized, however, the authority of a Tennessee court to decline jurisdiction over the accused in exceptional circumstances:

> [T]here is developing the view that if defendant's presence is acquired by "government conduct of a most shocking and outrageous character" which was "perpetrated by representatives of the United States Government," then due process would bar conviction.

W. LaFave and J. Israel, *Criminal Procedure* § 3.1 (1988).

After the trial court's denial of relief in this case, our court granted a stay of trial based upon the petitioner's allegations that the actions of the Tennessee authorities constituted "outrageous or illegal conduct . . . so extreme as to shock the conscience." Absent the holding in *Elliott*, the claim may not have been sufficiently colorable to have merited a stay. *Cf. Swanson v. State*, 749 S.W.2d 731 (Tenn.1988). Because of the rule in *Swaw*, precluding the grant of relief after a fair trial

resulting in a conviction, we determined that an interlocutory appeal was appropriate.

The state defends the trial court's dismissal without an evidentiary hearing on three possible grounds:

(1) In *United States v. Alvarez–Machain*, —— U.S. ——, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992), several months after the release of the *Elliott* opinion, the United States Supreme Court held that neither our extradition treaty with Mexico nor international law prohibited our government's forcible abduction of a Mexican citizen to answer criminal charges in this country.

(2) *Elliott* may have misinterpreted *Swaw*; any "outrageous or illegal conduct by the arresting authorities so extreme as to shock the conscience" could and should be raised as a substantive (rather than a procedural) defense and, if overruled, presented on direct appeal rather than upon a pretrial habeas corpus petition.

(3) The petitioner's allegations, if proved, do not "shock the conscience" and would not, therefore, serve as any basis for relief.

■ We will first consider the recent ruling of the United States Supreme Court. Humberto Alvarez–Machain, a Mexican physician, was indicted in this country for allegedly participating in the murder of United States Drug Enforcement Administration (DEA) Special Agent Enrique Camarena–Salazar and his pilot, Alfredo Zavala–Avelar. In 1990, Alvarez–Machain was kidnapped in Guadalajara at the behest of the DEA and returned to this country to face federal charges. Alvarez–Machain claimed that his abduction qualified as outrageous governmental conduct and violated the extradition treaty between the United States and Mexico.

The district court rejected the outrageous governmental conduct claim but held that it lacked jurisdiction to try Alvarez–Machain because of the violation of the extradition treaty. The court of appeals affirmed on the basis that a forcible abduction, coupled with protests by Mexico, authorized the defendant to invoke jurisdictional protection.

The United States Supreme Court characterized the case as one of first impression involving a claimed violation of an extradition theory and a forcible abduction. The decision of the court was based in great measure upon its analysis of three prior cases:

(1) *United States v. Rauscher*, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886). In *Rauscher*, it was held that one brought within a jurisdiction "by virtue of proceedings under an extradition treaty, can only be tried for one of the offences described in that treaty, and for the particular offence with which he is charged in the proceedings for his extradition...." *Id.* at 430, 7 S.Ct. at 246. Any additional charges must await release and a reinstitution of the extradition process. This has been referred to as the doctrine of speciality.

(2) *Ker v. Illinois.* The Supreme Court held that a defendant who had been kidnapped and forcibly returned to this country by a Pinkerton agent acting in a private capacity could, despite any extradition treaty between the involved nations, be put to trial for his offenses. Ker had been tried and convicted in an Illinois court by the time the issue was addressed in the Supreme Court. Peru, the asylum nation, did not object to Ker's prosecution.

(3) *Frisbie v. Collins.* The Supreme Court upheld a conviction of a defendant who had been kidnapped in Chicago by Michigan authorities and then tried and convicted in that state. The Supreme Court reasoned that the Michigan court had the power to try the defendant despite the forcible abduction and that due process of law had been satisfied by "a fair trial in accordance with the constitutional procedural safeguards." *Id.* 342 U.S. at 522, 72 S.Ct. at 512.

In *Alvarez–Machain*, our government was involved in the abduction. Mexico entered a protest. The Supreme Court examined the content of the treaty, determined that the United States and Mexico had made no agreement "to refrain from forcible abductions," observed that the "history of negotiation and practice under the Treaty" did not

prohibit abductions, and held that there was no implied term "prohibiting prosecution where the defendant's presence is obtained by means other than those established by the Treaty." *Id.* —— U.S. at ——, 112 S.Ct. at 2193–95.

In a vigorous dissent, Justice Stevens wrote that the action by the DEA violated the intent of the treaty. It cited *Rauscher* for the proposition that "the treaty constituted the exclusive means by which the United States could obtain jurisdiction over a defendant within the territorial jurisdiction of" the asylum nation. *Id.* at ——, 112 S.Ct. at 2200. "It is shocking," Stevens wrote, "that a party to an extradition treaty might believe that it has secretly reserved the right to make seizures of citizens in the other party's territory." *Id.* at ——, 112 S.Ct. at 2201. The dissent observed that the "critical flaw" in the majority's rationale was that it failed to distinguish the conduct of private citizens and governmental action. *Id.* at ——, 112 S.Ct. at 2203. It urged a differentiation between "private abductions" and official invasions and warned that the seriousness of the charges [1] should not influence the executive branch to "reinterpret the treaty":

> Indeed, the desire for revenge exerts "a kind of hydraulic pressure ... before which even well settled principles of law will bend," but it is precisely at such moments that we should remember ... our duty "to render judgment evenly and dispassionately according to law...." The way that we perform that duty in a case of this kind sets an example that other tribunals in other countries are sure to emulate.

*Id.* at ——, 112 S.Ct. at 2205–2206 (citations omitted).

The United States Constitution provides for the extradition of fugitives from justice:

> A person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall on demand of the executive authority of the state from which he fled, be deliv-

---

**1.** In December of 1992, Alvarez–Machain was acquitted of all charges and directed to be re-turned to Mexico.

ered up, to be removed to the state having jurisdiction of the crime.

U.S. Const. art. IV, § 2, cl. 2.

Extradition is authorized by federal statute. 18 U.S.C. § 3182. Its origin, therefore, is in the federal constitution and its implementation is by congressional enactment. State legislation is ancillary to the federal requirements. *State ex rel. Wiley v. Waggoner*, 508 S.W.2d 535 (Tenn.1973).

In *Michigan v. Doran*, 439 U.S. 282, 99 S.Ct. 530, 58 L.Ed.2d 521 (1978), Chief Justice Burger discussed the purpose of the constitutional provision:

The Extradition Clause was intended to enable each state to bring offenders to trial as swiftly as possible in the state where the alleged offense was committed. The purpose of the Clause was to preclude any state from becoming a sanctuary for fugitives from justice of another state and thus "balkanize" the administration of criminal justice among the several states. It articulated, in mandatory language, the concepts of comity and full faith and credit, found in the immediately preceding clause of Art. IV. The Extradition Clause ... served important national objectives of a newly developing country striving to foster national unity. In the administration of justice, .. national unity was thought to be served by de-emphasizing state lines for certain purposes, without impinging on essential state autonomy.

*Id.*, 439 U.S. at 288, 99 S.Ct. at 534–535 (citations omitted).

Article I, section 8 of the Tennessee Constitution provides that "no man shall be taken or imprisoned, or, disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." It has been said that there is no provision of our state constitution more salutary in its character than that forbidding the deprivation of the law of the land. The clause is synonymous with the due process provisions of the fifth and fourteenth amendments to the United States Constitution. *Daugherty v. State*, 216 Tenn. 666, 393 S.W.2d 739 (1965); *Dearborne v. State*, 575 S.W.2d 259 (Tenn.1978). A violation of one constitution is likely a violation of the other. *Illinois Cent. R. Co. v. Crider*, 91 Tenn. 489, 19 S.W. 618 (1892).

Yet the Tennessee Constitution has a quality independent of the United States Constitution, a concept embraced by the Tennessee Supreme Court. *See, e.g., State v. Middlebrooks*, 840 S.W.2d 317 (Tenn.1992); *State v. Jacumin*, 778 S.W.2d 430 (Tenn.1989). The issue, in this instance, is whether our law of the land clause is entirely analogous to the due process clauses of the United States Constitution or whether it affords privileges in interstate rendition not necessarily guaranteed fugitives who have sought asylum in other countries.

In *de la Beckwith v. Evatt*, 819 S.W.2d 453 (Tenn.Crim.App.1991), this court emphasized the summary nature of the state extradition procedure. The demanding state's determinations have the "presumption of regularity"; there is no plenary review in the asylum state. *Doran*, 439 U.S. at 290, 99 S.Ct. at 536. Our state's authority to review the propriety of the transfer to a demanding state has significant limitations:

(1) whether the extradition documents are in order on their face;

(2) whether the petitioner has been charged with a crime in the demanding state;

(3) whether the petitioner is the person named in the request for the extradition; and

(4) whether the petitioner is a fugitive.

819 S.W.2d at 456.

The procedures for extradition are generally matters of state law. *Martin v. Sams*, 600 F.Supp. 71 (E.D.Tenn.1984). Our state adopted the Uniform Criminal Extradition Act in 1951. Tenn.Code Ann. § 40–9–101 to –130. Kentucky did so in 1960. Ky.Rev. Stat.Ann. 440.150 to 440.420. All states but Mississippi and South Carolina have implemented the uniform act. Those states that have not adopted the model act, however, have their own statutory provisions authorizing extradition. The process in all states is relatively simple.

In recent years, expansions of the concept of federal due process of law have brought the *Ker–Frisbie* doctrine under review. By 1983, some jurisdictions restricted the application of the doctrine, recognizing as an exception those cases involving outrageous conduct, kidnapping, or torture by the governmental officials returning fugitives for trial. *See* 21 Am.Jur.2d, *Criminal Law* § 341. Under these extreme circumstances, the more traditional remedy has been a suit against those responsible on the theory of civil rights violation. Annotation, *Modern Status of Rule Relating to Jurisdiction of State Court to try Criminal Defendant Brought Within Jurisdiction Illegally or As Result of Fraud or Mistake*, 25 A.L.R. 4th 157, 161 (1983); 42 U.S.C. § 1983; *Crumley v. Snead*, 620 F.2d 481 (5th Cir.1980).[2] A minority view is that if the defendant's presence is acquired by shocking or outrageous governmental conduct, due process may deprive the court of jurisdiction over the accused. 1 W. LaFave and J. Israel, *Criminal Procedure* § 3.1 (1988); *see United States ex rel. Lujan v. Gengler*, 510 F.2d 62 (2nd Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975); *United States v. Lira*, 515 F.2d 68 (2nd Cir.), *cert. denied*, 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975); *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).

Perhaps the first signal of any deviation from the *Ker–Frisbie* doctrine came about in the case of *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Justice Frankfurter wrote for the majority:

Regard for the requirements of the Due Process Clause "inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings [resulting in a conviction] in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peo-ples even toward those charged with the most heinous offenses."

\* \* \* \* \* \*

Applying these general considerations to the circumstances of the present case, we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience. . . .

\* \* \* \* \* \*

Due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend a "sense of justice."

*Id.*, 342 U.S. at 172–173, 72 S.Ct. at 208–210.

In *United States v. Toscanino*, 500 F.2d 267 (1974), the Second Circuit cited *Rochin* and held that due process required a court to divest itself of jurisdiction over the person of a defendant brought from an asylum country when the government had acquired his presence by "deliberate, unnecessary [and] unreasonable invasion of . . . constitutional rights." *Id.* at 275.

The wisdom of the rule established in *Alvarez–Machain* is questionable. Mexican officials certainly took umbrage. Over two hundred years ago, Thomas Paine made a statement that may have some application:

He that would make his own liberty secure must guard even his enemy from oppression; for if he violates this duty he establishes a precedent that will reach to himself.

*The Complete Writings of Thomas Paine* 588 (P. Foner ed. 1945).

Our populace, long weary of the international nature of the war against illegal drugs, may find the *Alvarez–Machain* decision acceptable so long as Mexico and other coun-

---

2. The Sixth Circuit is the only federal appeals court that has declined to recognize a § 1983 cause of action for violation of extradition rights. *See Stockwell v. Friberg*, 272 F.2d 386 (6th Cir. 1959). *See also Martin v. Sams*, supra. In *Hampton v. United States*, 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976), the Supreme Court held when "the police engage in illegal activity . . . beyond the scope of their duties, the remedy lies, not in freeing . . . defendant, but in prosecuting the police under the applicable provisions of state or federal law."

tries refrain from kidnapping American citizens to stand trial on foreign charges. Even today extradition as between countries is a subject worthy of diplomatic debate; on occasion, there may be reason to dispense with political niceties. There is little reason, however, to fear "balkanization" as between states. And, there is every reason to avoid the antipathy which would necessarily result from overly zealous state officials purposefully circumventing the extradition process.

In *Toscanino,* the court quoted former Justice Brandeis in enunciating its philosophy:

Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government become a lawbreaker, it breeds contempt for law. It invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine, this court should resolutely set its face.

*Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

Although the *Toscanino* court drew a distinct analogy between action of law enforcement officers resulting in the application of the exclusionary rule and governmental conduct so shocking as to deny due process, the remedy was not to acquit the defendant. Instead, the court simply divested itself of personal jurisdiction—"decline[d] to exercise jurisdiction over a defendant whose presence has been secured by force or fraud." 500 F.2d at 275. As a matter of fundamental fairness, the court felt obliged to return the defendant to his *status quo ante. Id.* The *Toscanino* court caused a remand to the trial

court for a determination of whether there was governmental conduct in the kidnapping of the defendant in Uruguay and whether his return to the United States violated due process. *Id.* at 275–276. The court recognized the *Ker–Frisbie* doctrine as the general rule but found it "subject to the overriding principle that where the Government itself secures the defendant's presence in the jurisdiction through use of cruel and inhuman conduct amounting to a patent violation of due process principles, it may not take advantage of its own denial of the defendant's constitutional rights. . . . [A] court must 'divest itself of jurisdiction. . . .' " *United States v. Lira,* 515 F.2d at 70 (*citing United States v. Toscanino,* 500 F.2d at 275). Essential is the finding that "the gross mistreatment leading to the forcible abduction of the defendant was perpetrated by representatives of the United States Government." *Lira,* 515 F.2d at 70.

■ In *Lujan,* the Second Circuit clarified its ruling in *Toscanino.* Although upholding the newly recognized exception to the general rule, the court proclaimed that mere irregularities would not vitiate the extradition. The conduct must be of "a most shocking and outrageous character." 510 F.2d at 65. We agree with that characterization.

This line of cases has as its core the 1886 decision in *Rauscher:*

Our constitution declares a treaty to be the law of the land. It is consequently to be regarded in courts of justice as equivalent to an act of the legislature . . .; when the terms of the stipulation import a contract, . . . the treaty [is] political, not . . . judicial . . ., and the legislature must execute the contract before it can become a rule for the court.

119 U.S. at 418, 7 S.Ct. at 239–240. In *Rauscher,* the Supreme Court determined that the *Webster–Ashburton* treaty between the United States and Great Britain prohibited the prosecution of the defendant for a crime other than that for which he had been extradited. There could be no trial on additional charges "until a reasonable time and opportunity have been given him, after his release or trial upon such charge, to return

to the country from whose asylum he had been forcibly taken under those proceedings." 119 U.S. at 430, 7 S.Ct. at 246.

In *Elliott,* our court implicitly ruled that there was no inconsistency in this developing trend of the law and the case of *Swaw v. State,* 3 Tenn.Crim.App. 92, 457 S.W.2d 875 (1970). *Swaw,* a post-conviction relief case in which the petitioner sought to set aside a prior guilty plea, determined that due process had been afforded by the extension of the right to trial with all procedural safeguards guaranteed by the Constitution. Prior defects in the extradition process, no matter how egregious, provided no basis for relief. We adhere to the holding in *Swaw.*

> In *Elliott,* our court concluded as follows: We see merit in adopting a policy which promotes adherence by law enforcement to the statutory provisions governing extradition without, at the same time, placing undue procedural obstacles in bringing the out-of-state defendant to justice. We hold that once the petitioner is brought within the boundaries of this state, absent outrageous or illegal conduct by the arresting authorities so extreme as to shock the conscience, he may be placed upon trial for any charges pending.

816 S.W.2d at 339.

 In our view, *Swaw* stands for the proposition that after a fair trial and conviction, there is simply no remedy available irrespective of the nature of the governmental action bringing the defendant into this jurisdiction. The *Ker–Frisbie* doctrine would prevail. The failure to assert any due process violation before trial would serve as a waiver of personal jurisdiction. If, however, the procedure is challenged in advance of trial and an evidentiary hearing establishes that the conduct of governmental authorities, as opposed to that of any private individual, is so illegal and outrageous as to shock the conscience of the court, the law of the land clause provides a measure of relief. *See* Tenn. Const. art. I, § 8. The accused must be returned to the asylum state pending the initiation of the extradition procedure.

 In this day and age, time and travel as between states are rarely significant fac-tors. Interstate comity in the prosecution of crime is a desired goal. The Uniform Criminal Extradition Act evinces a clear legislative intent. The statutory procedure governing the arrest and return of fugitives residing in another state is summary in nature. Tenn. Code Ann. § 40–9–101 to –130. Although a return to the asylum state may appear to place form above substance, outrageous conduct by Tennessee officials in willful disregard of our extradition law violates due process and, in our view, suspends the jurisdictional authority of our courts in the criminal prosecution. *Cf. State ex rel. Anglin v. Mitchell,* 575 S.W.2d 284, 287 (Tenn.1979). A pretrial challenge is the appropriate procedure to question jurisdiction under circumstances such as these. So long as habeas corpus is pretrial, it is not inappropriate:

> It is of the historical essence of habeas corpus ... to test proceedings so fundamentally lawless that imprisonment ... is void.

*Fay v. Noia,* 372 U.S. 391, 423, 83 S.Ct. 822, 840, 9 L.Ed.2d 837 (1963).

 Because there was no hearing afforded by the trial court in this case, the record does not demonstrate, as the state suggests, that there was an absence of outrageous conduct on the part of governmental authorities. The good or bad faith of the officers involved is an important factor. While it may be unlikely that the petitioner can prove such outrageous conduct on the part of state officials as would entitle him to habeas corpus relief, that is a question of fact for which an evidentiary hearing is entirely appropriate.

We reiterate our holding in *Elliott.* Accordingly, the judgment is reversed and the cause is remanded for a hearing on the petition for habeas corpus.

SCOTT, P.J., and W. FRANK CRAWFORD, Special Judge, concur.